[Civ. No. 22129. Fourth Dist., Div. One. Apr. 21, 1980.]

KGB, INC., Plaintiff and Respondent, v.
TED GIANNOULAS, Defendant and Appellant.

---

COUNSEL

Sullivan, Jones & Archer, Christopher Q. Britton, Richard W. Page and William J. Tucker for Defendant and Appellant.

Sandler & Rosen, Richard V. Sandler and John D. Butler for Plaintiff and Respondent.

---

OPINION

**BROWN (Gerald), P. J.**—Viewed in its most obvious aspect, this controversy about a chicken suit poses the simple issue whether a local radio station may prevent its ex-employee/mascot from wearing a chicken suit. Silly though the issues appear at first glance, the underlying principles are serious. We deal with a conflict between an employer's asserted contract rights and the fundamental rights of an employee to earn a living, even in possible violation of the employer's bargain with him. We are also concerned with interpreting the application of California's restraint of trade statute (Bus. & Prof. Code,[1] § 16600) to an entertainment contract which ostensibly restricts the entertainer from continuing to perform after a breach.

Appellant Ted Giannoulas seeks a writ of supersedeas to stay a preliminary injunction which he has appealed.

While employed by respondent radio station, KGB, Inc., Giannoulas made public appearances as a character known as the "KGB Chicken," a costumed chicken performing comic routines. Giannoulas stopped working for KGB. The station brought this lawsuit alleging breach of employment contract, unfair competition, servicemark infringement, and other causes. KGB sought both damages and an injunction prevent-

---

[1]All section references are to the Business and Professions Code unless otherwise specified.

ing Giannoulas from appearing in a chicken suit. Although at present all counts of the complaint except that for breach of contract have been dismissed on demurrer with leave to amend, the trial court granted KGB a preliminary injunction. Paragraph (1)[2] of the injunction prevents Giannoulas from appearing anywhere wearing the "KGB Chicken Ensemble," a described costume which includes a vest bearing the KGB initials. Subsection (c) of paragraph (1) forbids appearing in a chicken costume "substantially similar" to the KGB chicken costume registered as a servicemark. Paragraph (2) restrains Giannoulas from appearing in "any chicken ensemble or suit whatsoever" in San Diego County or any adjacent county. Paragraph (3) similarly forbids appearances in any chicken suit at any sports or public event where a team from San Diego County appears. The trial court found "likelihood of confusion" in the public mind if Giannoulas appears in the manner forbidden. The meaning of that finding is when Giannoulas appears locally in a chicken suit the public probably thinks about KGB and may believe Giannoulas still works there.

■■■ We have decided to issue a writ of supersedeas to stay subsection (c) of paragraph (1) and all of paragraphs (2) and (3) of the injunction pending appeal. Those provisions, preventing appearances in any chicken suit whatsoever, invalidly restrict Giannoulas' rights to earn a living and to express himself as an artist. The burden is on KGB to justify an injunction restricting such vital rights. When the injunction issued, KGB had not so much as pleaded a good cause of action for unfair competition or infringement. Its factual showing to date is inadequate to sustain a prohibitory injunction, for reasons we will state.

Public policy disfavors injunctions restraining the right to pursue a calling. On the national scene, the weight of authority shows great reluctance to issue such restraints unless the former employer can show irreparable injury. (See, e.g., 11 Williston on Contracts (3d ed. 1968) §§ 1423, 1450, pp. 789-791, 1044; Rest., Contracts (1932) § 380, com. (g); *Arthur Murray Dance Studios of Cleveland* v. *Witter* (1952) 62

---

[2]Paragraph (1) prohibits Giannoulas from: "Appearing anywhere wearing the KGB Chicken ensemble or suit. The KGB Chicken is defined to be: (a) a design of a chicken red in color, with brown face, yellow beak, yellow webbed feet, blue eyelids, blue vest with the letters 'KGB,' and a red comb on the top of his head, or (b) a design of a chicken as depicted in Plaintiff's Certificate of Registration of Service Mark No. 5049 from the State of California attached as Exhibit 'C' to the complaint herein, or (c) any design substantially similar to (a) or (b) above."

Exhibit "C" is a picture of a chicken costume with KGB letters on it.

Ohio L.Abs. 17 [105 N.E.2d 685].) California goes beyond judicial reluctance to possible illegality of such injunctions, under section 16600, which provides in relevant part: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." This statute presents an absolute bar to postemployment restraints and represents a strong public policy of this state (*Golden State Linen Service, Inc.* v. *Vidalin* (1977) 69 Cal.App.3d 1, 12-13 [137 Cal.Rptr. 807]; *Muggill* v. *Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 242 [42 Cal.Rptr. 107, 398 P.2d 147]; *Ware* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1972) 24 Cal.App.3d 35, 43 [100 Cal.Rptr. 791], affd., 414 U.S. 117 [38 L.Ed.2d 348, 94 S.Ct. 383]). Although there are a few statutory exceptions to the ban against restraints of trade, none of them apply to this situation, where the employer seeks to restrain a performer from continuing to perform after the term of employment expires. Here it expired in September 1979.

The classic exposition of the topic of enforcement of employee covenants not to compete is *Arthur Murray Dance Studios of Cleveland* v. *Witter, supra,* 105 N.E.2d 685, decided in a state (Ohio) which did not have a statute like California's Business and Professions Code section 16600. That case, with wit but also much scholarly erudition, documented the "sea" of authority evidencing judicial reluctance to enforce such covenants. According to the court, this hostility first judicially appears in the reign of Henry V in 1415, when a guild sought to restrain a dyer from working in a town for half a year, enraging the judge, who "in bad French...cursed the deal void: 'By God, if the plaintiff were here he should go to prison until he paid a fine to the king.'" (*Id.* at p. 691.) Since then the courts have become more temperate, and will sometimes enforce such covenants at least in states not having statutes like section 16600, if such enforcement is reasonable; but even in those states, reasonableness is not lightly decreed, and always, the burden rests on the person seeking such a restraint to justify it. Further, of the many circumstances relevant to reasonableness (detailed in the *Arthur Murray* case, *supra*), the most important is irreparable harm to the employer. Nothing less justifies preventing an employee from continuing to work. The court in that case compared the so-called sale covenant with the employee covenant and explained the stronger aversion to enforcing the latter: "In contrasting the employee covenant with the sale covenant, some of the typical pronouncements are—the employee covenant is more critically examined, more strictly construed—it is construed favorably to the employee—it is viewed with askance and more

jealousy—it is not viewed as liberally or with the same indulgence—it is looked upon with less favor, more disfavor—courts are more loathe, less disposed and more reluctant to sustain or enforce it—not identical tests but different considerations apply—there is more freedom of contract between seller and buyer than between employer and employee,—the latitude of permissible restraint is more limited between employer and employee, greater between seller and buyer. The following are some of the reasons given for making the above distinction. The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of his employer. Moreover, an employee ordinarily is not on the same plane with the seller of an established business. He is more apt than the seller to be coerced into an oppressive agreement. Under pressure of need and with little opportunity for choice, he is more likely than the seller to make a rash, improvident promise that, for the sake of present gain, may tend to impair his power to earn a living, impoverish him, render him a public charge or deprive the community of his skill and training. The seller has the proceeds of sale on which to live during his period of readjustment. A seller is usually paid an increased price for agreeing to a period of abstention. The abstention is a part of the thing sold and is often absolutely necessary in order to secure to the buyer the things he has bought. Usually the employee gets no increased compensation for agreeing to the abstention; it is usually based on no other consideration than the employment itself." (*Arthur Murray Dance Studios of Cleveland* v. *Witter, supra,* 105 N.E.2d at pp. 703-704.)

In California under section 16600, even reasonableness may not save an injunction like that here. There is authority in California for enjoining employee performance, after breach of an entertainment contract, *during the term of the contract,* under Civil Code section 3423, permitting injunctions for breach of special service contracts. (See *MCA Records, Inc.* v. *Newton-John* (1979) 90 Cal.App.3d 18, 23 [153 Cal.Rptr. 153].) The court in *MCA Records,* however, expressed grave doubts whether such an injunction would be legal beyond the term of the employment contract. (*Id.* at p. 24.) Those doubts are shared by the court in *Lemat Corp.* v. *Barry* (1969) 275 Cal.App.2d 671, 679 [80 Cal.Rptr. 240]; see also dictum in *Loew's Inc.* v. *Cole* (9th Cir. 1950) 185 F.2d 641, 657. Here the written contract of employment expired on

September 15, 1979, if it was not sooner terminated, as alleged, in late May 1979.

■ Further, even if the injunction were permissible despite section 16600, such an injunction must rest on a finding of injury to KGB. As the court said in *Arthur Murray, supra*, we must consider whether an "ex-employee is a threatening menace." (105 N.E.2d at p. 708.) There is no evidence of menace to KGB from the free publicity complained of, aside from a conclusionary allegation of irreparable harm. The court noted in *Arthur Murray, supra*: "Remembering that the burden is on Arthur Murray to prove irreparable injury, where is the proof? Certainly there is not one microscopic bit of evidence of actual injury. It is not shown that Arthur Murray lost one pupil or one penny." (105 N.E.2d at p. 703.) To paraphrase, where are the lost listeners? Likelihood of confusion is insufficient; the confusion must be hurtful to the employer before an injunction is justified.

In this state, as elsewhere, under the general umbrella of the tort of unfair competition, a number of employee practices may be enjoined, such as purloining of trade secrets or misleading copying of products or services. KGB seeks to justify this injunction on that basis, resting on the finding of likelihood of confusion, which is the jargon of unfair competition law. We think, however, Giannoulas' performances in a chicken costume are neither competitive nor unfair because he does not sport the KGB logos or otherwise imply he represents KGB. The essence of the tort of unfair competition is the inequitable pirating of the fruits of another's labor and then either "palming off" those fruits as one's own (deception) or simply gaining from them an unearned commercial benefit. (See, e.g., *Warner Bros. Pictures* v. *Columbia Broadcasting System* (9th Cir. 1954) 216 F.2d 945, 951 [use of character "Sam Spade" from "The Maltese Falcon" not unfair competition because no deception or palming off, and not within scope of copyright protection on novel]; *Geisel* v. *Poynter Products, Inc.* (S.D.N.Y. 1968) 283 F.Supp. 261, 267 [TRO issued to prevent sale of dolls and toys like "Dr. Seuss" characters because of false impression of authorization by Seuss]; *Sullivan* v. *Ed Sullivan Radio & T.V.* (1956) 1 App.Div.2d 609 [152 N.Y.S.2d 227] [restraining use of diminutive "Ed" because of threat of public confusion with name of celebrity Ed Sullivan]; *International News Service* v. *Associated Press* (1918) 248 U.S. 215 [63 L.Ed. 211, 39 S.Ct. 68, 2 A.L.R. 293] [essence of unfair competition is taking another's labor and exploiting it, reaping what another has sown; palming off not essential].)

First, and probably most essential, the remedies sought in the above cases were not injunctions restraining pursuit of one's livelihood. Thus, even if we had a case of unfair competition here, the injunctive remedy would probably be inappropriate for the reasons already stated. Next, probably there is no case of unfair competition here, for the evidence so far shown to us does not establish misappropriation by Giannoulas of KGB's labor. We are not in a position to determine the relative inputs of KGB and Giannoulas to the KGB chicken concept, but we note the inevitable significance of the performer's contribution to a fluid, changing, clownish role of the type here considered. It is created spontaneously through gestures, movements and responses to changing situations. KGB cannot be said to own such a routine. As a writer for the San Francisco Chronicle expressed it: "He was suspended Monday, and KGB is looking for a new man behind the outfit.

"Which is about as hopeless as having an understudy step in for Lawrence Olivier.

"The Chicken suit itself is amusing, but Giannoulas' artistry is what makes it work. He's a dancer, a showman, and an athlete, and his timing is flawless. When the Padres return home May 3, there's a pretty good chance he'll be there. A replacement? Forget it."

Or, in Giannoulas' words: "My 'act' was developed through five hard years of conscious effort in front of mirrors and working out of techniques and style at my home. In addition, a large part of my act evolved through spontaneity, keeping in those gestures and actions which evoked a favorable audience reaction. My style is a combination of mannerisms, gestures, posture, and timing which evolved from years of taking chances in live performances gauging the audience reaction. When I attend an athletic event, I am required to provide continuous entertainment for periods of from two to three hours. It would be impossible to have a planned routine to depend on for this type of entertainment. Rather, I must react to people and situations as they are presented. However, my years as the Chicken has caused me to evolve into that whacky character when I am in the costume. The Chicken has a style of his own. Mannerisms, gestures, reactions developed for performances averaging 70 hours per week. To me, the costume is skin which I bring alive when I enter."

We deal not with a stereotyped character such as The Lone Ranger or Yogi Bear, but with a clown in a chicken suit. His performances fol-

low no set script. Only the costume itself has a fixed design, and we, by permitting subsections (a) and (b) of paragraph (1) of the injunction to stand, recognize KGB's probable rights in that particular design. KGB has not cited us a case, however, nor have we unearthed one, where it was regarded as unfair competition for a clown to change his employer.[3] Only in a breach of contract situation may such conduct be enjoinable, and then, probably only in a state where there is no statutory ban on restraints of trade as we have here.

The employment contract between KGB and Giannoulas does not expressly give KGB the right to prevent Giannoulas from performing. The most pertinent part of the agreement provides: "For a period of five years after termination of this agreement, employee agrees not to act as a mascot of any radio station other than KGB, Inc., in the San Diego market." This language does not give KGB a perpetual monopoly of all chicken ensembles and routines; it refers only to employment by another radio station, i.e., competition.

KGB relies specifically on two other contractual provisions. The 1978 contract provides: "'Employee agrees and acknowledges that the costume, concept, and the KGB Chicken are the exclusive property of employer, and the KGB Chicken is a registered tradename and a valid copyright of employer. Employee agrees not to take any action inconsistent with said rights of employer in and to the concept of the KGB Chicken.'" KGB claims this language establishes its contractual monopoly of all rights in the KGB Chicken and of the "costume" or the "concept" of a chicken. The 1974 contract provides: "'(a) I hereby acknowledge that the...characters and all other subject matters broadcast over the station as well as any name assigned to me by the station for broadcast purposes, are and shall remain, both while this contract shall be in effect and at all times thereafter, the station's exclusive property in any and all fields, and that I shall not at any time

---

[3]The cases KGB relies on do not support its position. *Lone Ranger, Inc.* v. *Cox* (4th Cir. 1942) 124 F.2d 650, involved a defendant who untruthfully billed himself as the "original Lone Ranger," which misled the public and constituted unfair competition. That case is different from this because the Lone Ranger is a specific well-defined character, with a name, specific garb, and appearance, unlike the case of an antic chicken dependent on individual performances for its life. Similarly inapposite are *Boston Pro Hockey Ass'n.* v. *Dallas Cap. & E. Mfg. Inc.* (5th Cir. 1975) 510 F.2d 1004 [copying servicemark emblems of hockey teams], and *Walt Disney Productions* v. *Air Pirates* (N.D.Cal. 1972) 345 F. Supp. 108, 116 [copyright infringement of character Mickey Mouse].

obtain any right, title or interest whatsoever in or to such property or a part thereof.

"'(b) Any ideas, including but not limited to, programs, themes, titles, characters, which are developed by me during the term of my employment, shall be the property of this station.'" KGB claims these provisions indicate the parties' intent to vest exclusive ownership of the KGB Chicken character in KGB.

These arguments tend to buttress KGB's claim to an exclusive right to the specific character, the KGB Chicken, an antic chicken bearing the KGB insignia, colored in a definite manner, and appearing on behalf of the station. These contractual provisions do not, however, create a contractual monopoly of all appearances by Giannoulas in any chicken costume. In general, contractual language contained in employees' negative covenants not to compete is strictly construed against the employer because of the policy against such bargains which we have described. (E.g., *W.R. Grace & Co.* v. *Hargadine* (6th Cir. 1968) 392 F.2d 9, 20; Rest., Contracts, § 236, subd. (f), p. 328; § 515, p. 988.) Here the specific chicken referred to is the KGB Chicken, and we have permitted the restriction on appearances as that character to stand. Further restriction is not warranted by the parties' express bargain.

We have found no precedent defining the respective rights in fictional characters of the artist who plays the role, the employer who finances and assists him, and members of the general public who choose to imitate aspects of the character in question. The rights vary from case to case depending on such facts as the contracts in effect and the relief sought. There is precedent, which we shall discuss, establishing an actor has a strong claim to exclusive monopoly of a fictional role he has created. The employer may also have rights in such role, particularly when he seeks to assert them against infringing third parties rather than against the employee/actor. However, because of the policies we have discussed, the employer has a weak case against his employee when he seeks to prevent future performances, unless he can point to a specific contract conferring such rights. His naked claim of having assisted the development of the role is not enough; presumably he has been compensated for that assistance by the revenues from performances while the employee still worked for him. Should he desire more, in the nature of continuing royalties or control of the character, then he must bargain for that control. Further, in California section 16600 limits his available remedies.

Both sides here have sought comfort in passages from *Lugosi* v. *Universal Pictures* (1979) 25 Cal.3d 813 [160 Cal.Rptr. 323, 603 P.2d 425]. That case discusses the inheritability of the rights to the "uniquely individual likeness and appearance of Bela Lugosi in the role of Count Dracula." The issues there determined do not decide this matter. The contest was not between employer and employee but between past employer and the employee's legal heirs. In his concurring opinion, Justice Mosk pointed out actors have protected rights in roles which they play and develop. That language gives some philosophic support to Giannoulas' proprietary claim to his chicken routine, but does not advance the claim of KGB, inasmuch as Universal's rights to the Lugosi role were not in issue except insofar as they were abridged by exclusive exploitation rights in the heirs. Similarly, the dissent of Chief Justice Bird, with its emphasis on the individual's rights to decide how and when to exploit his identity and to enjoy the fruits of his labor, lends some support to Giannoulas, none to KGB. (See especially her discussion of *Uhlaender* v. *Hendricksen* (D.Minn. 1970), 316 F.Supp. 1277, 1282, and similar cases.)

Similarly inapposite, except in a philosophical sense, is *Guglielmi* v. *Spelling-Goldberg Productions* (1979) 25 Cal.3d 860 [160 Cal.Rptr. 352, 603 P.2d 454]. ▪ There, however, Chief Justice Bird discusses the vital role of the First Amendment in protecting entertainment. She regards performing as an integral part of self-expression: the development of ideas, exploration of the mind, realization of the self. The cases she cites all imply the right of expression through a fantastical role is fundamental: not only the commercial right to earn a living, but also personal freedom of artistic expression. (See *Zacchini* v. *Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562, 578 [53 L.Ed.2d 965, 97 S.Ct. 2849]; *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 535, fn. 6 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]; *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 242 [49 Cal.Rptr. 537, 411 P.2d.) These cases and others grant damages for exploitation of an artist's performance, based on the premise the developed character belongs to the performer and is his to exploit or leave alone. (See *Ettore* v. *Philco Television Broadcasting Corporation* (3d Cir. 1956) 229 F.2d 481; *Waring* v. *WDAS Broadcasting Station, Inc.* (1937) 327 P. 433 [194 A. 631].)

Misappropriation of rights in a stage character can of course occur, but it takes a strong showing to restrict the allegedly infringing performer. For example, in *West* v. *Lind* (1960) 186 Cal.App.2d 563 [9

Cal.Rptr. 288], Mae West lost her suit to enjoin defendant's appearance in the role of "Diamond Lil," which West claimed to have developed. The trial court found the role was not exclusively associated with West nor impressed with her identity in the public mind, hence she had no exclusive claim to it, despite her undisputed contributions to the role. It does not appear KGB has staked a valid claim to another's comic routine, at the preliminary injunction stage, when West could not monopolize the role she herself had played, for which she claimed sole credit. West's claim was also stronger than KGB's because the Diamond Lil character is well defined and specific, whereas here we deal with the ever changing performance of an antic routine.

KGB asserts because Lugosi played the Dracula role without a mask, the concept of the "unique individual likeness of the actor" as property, developed in the *Lugosi* opinion, does not apply to Giannoulas' performances in a chicken suit which hides his features. Facial expressions are hardly a necessary attribute of a fantastic character. Masked or not, both Lugosi and Giannoulas have made certain roles their own, by a combination of mannerisms, gestures, body language, and other behavior adding up in each case to a unique character. We see no reason why the concept of unique individual likeness should not apply to the role of antic chicken whose turns, kicks, tumbles and gyrations have become uniquely those of Giannoulas. What is more, we view with skepticism KGB's assertion it makes no difference who wears the costume. If that were so, why did KGB pay Giannoulas some $50,000 a year to wear it? The identity of the performer clearly has some relevance here.

■ KGB seeks to rely on Labor Code section 2860, asserting everything an employee "acquires by virtue of his employment" other than his wages, belongs to his employer, citing also language in *Lugosi v. Universal Pictures, supra*, 25 Cal.3d 813, and *Zahler v. Columbia Pictures Corp.* (1960) 180 Cal.App.2d 582, 589 [4 Cal.Rptr. 612]. KGB has misinterpreted those authorities. The language in the statute has been applied to protect employee misappropriation of trade secrets and confidential information gained during employment; it has not been used to protect an actor's or artist's creations during employment in the absence of a contract providing express protection. (See discussion in dis. opn. of Bird, C. J., in *Lugosi, supra*.) In *Zahler, supra*, the court found a deceased composer's widow had no rights to decedent's musical compositions composed as motion picture background music because decedent had conveyed those rights to an agent who licensed the defendant television station to use them, and also the studio

had fully compensated decedent for those scores, and they were created as part of his employment and hence belonged to the employing studio. That case is a far cry from KGB's claim to the right to monopolize for all time Giannoulas' chicken routine. Songs already written are different from a continuing right to compose, or, as here, to perform.

In addition to First Amendment and right to livelihood considerations, we also note a strong policy in the law of trademarks and servicemarks to prevent monopoly of generic names or of functional or utilitarian aspects of products. (*Application of Deister Concentrator Company* (1961) 289 F.2d 496, 504 [129 U.S. Pat. Q. 314].) The use of terms such as "shredded wheat," "cola," or "thermos" cannot be protected unless the term is coupled with other words so as to confuse the public. (See, e.g., *Kellogg Co.* v. *Nat. Biscuit Co.* (1938) 305 U.S. 111, 116; [83 L.Ed. 73, 77, 59 S.Ct. 109]; *King-Seeley Thermos Co.* v. *Aladdin Industries, Inc.* (2d Cir. 1963) 321 F.2d 577, 581 (mod. in pt., 320 F.Supp. 1156); "cola" to refer to drinks flavored from the cola nut (*Cola-Cola Company* v. *Cahill* (W.D.Okla. 1972) 350 F.Supp. 1231, 1234, affd. (10th Cir. 1973) 480 F.2d 153.) Similarly, aspects of a product which are functional cannot be monopolized. Examples include the size and shape of pills (*Smith, Kline & French Laboratories* v. *Clark & Clark* (3d Cir. 1946) 157 F.2d 725, 730); the shape, size and color of fishing lures (*James Heddon's Sons* v. *Millsite Steel & Wire Works* (6th Cir. 1942) 128 F.2d 6, 13); or the design of clothing (*J. C. Penney Co.* v. *H. D. Lee Mercantile Co.* (8th Cir. 1941) 120 F.2d 949, 954-955; see also *Tomlin* v. *Walt Disney Productions* (1971) 18 Cal. App.3d 226, 236 [96 Cal.Rptr. 118] [concept of "Love Bug"]). By analogy to these principles, it appears chicken suits or chicken costumes as a class ought not to be subject to exclusive monopoly. (Cf. *Standard Paint Co.* v. *Trinidad Asphalt Mfg. Co.* (1911) 220 U.S. 446, 453 [55 L.Ed. 536, 31 S.Ct. 456].) Chicken costumes were already in common use in comic routines before the KGB Chicken came on the scene, and cannot be taken from the public now. (Cf. *Polish N. C. Church, Etc.,* v. *Diocese of Buffalo* (Equity Term, Supreme Ct. 1918) 171 N.Y.S. 401, 403.) For one of countless possible examples, consider Charlie Chaplin's chicken-suited appearance in the motion picture "Gold Rush."

■ A person appearing in a chicken costume cannot be a servicemark. A servicemark is an emblem or logo used in the sale or advertising of services to identify their source. (See 15 U.S.C. § 1127; Bus. & Prof. Code, § 14206.) Servicemarks may be registered and

protected like trademarks. (15 U.S.C. § 1053; Bus. & Prof. Code, § 14230.) To be entitled to such protection the mark must be stationary and unchanging. For example, a fanciful king who eats hamburgers in a television commercial cannot be registered as a servicemark (*In re Burger King Corp.*, (1974) 183 U.S.P.Q. 698). Further, a servicemark must not be the service itself, but rather, a designation of its source. (See *Cebu Association of California, Inc.* v. *Santo Nino de Cebu USA, Inc.* (1979) 95 Cal.App.3d 129, 137 [157 Cal.Rptr. 102].) Here the service is entertainment in a chicken suit, yet it is that activity which KGB seeks to monopolize.

In fact, the concept of parading as a mascot in an animal costume would seem to be in the public domain. Certainly it is commonplace and a number of similar fictional animal characters coexist in the media; for example, note Yogi Bear, Smokey the Bear, Winnie the Pooh, and the California Bear acting as mascot for the University of California. Can the creator of any of these bears be seriously contended to have a monopoly of all fictional bears? We think it possible for the present KGB Chicken and the Giannoulas chicken likewise to coexist.

KGB asserts it has now registered the figure of the KGB Chicken as a servicemark with the State of California and with the Federal Patent and Trademark Office. It further argues, without giving authority, the mark once registered in a two-dimensional form may not be "exploited" in a three-dimensional form without KGB's permission. There is no "exploitation." To exploit a servicemark means essentially to engage in some act of unfair competition; to use a confusingly similar mark, to palm off goods or services, to pirate the fruits of another's industry. We have already discussed why the evidence does not show inequitable piracy of the fruits of KGB's labor.

KGB also claims the service here involved is not entertainment, but is radio station broadcasting. The assertion is false. The service enjoined is entertainment in a chicken suit; Giannoulas is not in the radio broadcast business. His performances are too fluid and changing to be a servicemark of some other service, such as broadcasting, and they cannot be owned by anyone, other than pursuant to a valid contract.

Finally, KGB claims we have no jurisdiction to make factual findings contrary to those of the trial court. Specifically, it claims we have not honored the finding of secondary meaning, essentially a finding any cos-

tumed chicken at a sports or public event in the designated area is associated with KGB in the public mind. We accept that finding. It is insufficient to show irreparable harm, or indeed any harm, and it does not warrant a preliminary prohibitory injunction restricting constitutionally protected freedoms, and possibly violating a statute as well. On the subject of irreparable injury, the record shows Giannoulas has become a nationally known figure.[4] KGB is a station which can transmit,

[4]Giannoulas has also become an internationally known figure. The Encyclopedia Britannica Book of the Year 1980 under Biographies, page 78, recognizes him in the following article in which KGB, no doubt to its delight, receives publicity:

### Giannoulas, Ted

When baseball's "chicken man" emerged from a giant egg in the San Diego Padres' infield on June 29, 1979, it was just a rehatch. He had first arrived fully fledged in Dayglow fluff five years earlier to hand out Easter eggs at the local zoo as part of radio station KGB's "promotional experiment." But the bird's inner being, 5-ft 4-in Ted Giannoulas, had bigger ideas. A communications student at San Diego State University, he suggested that KGB send him to Padres games in the fine-feathered costume. He became a fixture on and around the diamond, and the station rose from fifth to first place in local media standings.

Cavorting through the stands, lifting a web-footed leg at the umpires, smothering

© 1979 EILEEN MILLER—BLACK STAR

an occasional pretty fan's head in his yellow beak, the chicken man was soon responsible for attracting more than one out of ten spectators to the stadium. Ted Turner, the Atlanta Braves' flamboyant owner, offered Giannoulas $100,000 to turkey trot down to Georgia. But the cackling celebrity decided to keep San Diego as his home base and turn free-lance—a decision that got his suit sued off.

The trouble started when he took off the vest showing KGB's call letters for an away-from-home game. The station fired him, shooed him into court claiming $250,000 in damages, and hired a substitute. But the fans threatened such mayhem that the substitute was fitted with a bulletproof vest, though nothing worse came his way than game-delaying boos. Enjoined from wearing KGB's outfit or calling himself a chicken, Giannoulas bought a new fowl suit to prance the foul lines and went to work as an attraction without a name. Offered a percentage of the gate receipts by the Padres, he was escorted by motorcycle policemen onto the field inside the styrofoam egg atop an armoured truck and emerged to the tune of *Thus Spake Zarathustra*. KGB kept the legal heat on for a while but lost listeners and ended up eating crow.

Giannoulas was not alone in the world of professional sports clowns, nor was he the first "bleacher creature." But he was the most celebrated. Now earning more than $100,000 a year, he belly flopped around the bases on national television during one All-Star Game and received the legislature's official commendation for "comedy contributions to the State of California."

(PHILIP KOPPER)

on a clear day, as far as Oceanside. This station claims a perpetual monopoly on chicken routines in local counties; if that claim were not preposterous enough, it further contends injury because its former employee has made it nationally famous. The claim of irreparable injury in this context is ridiculous.

The fact the servicemark and unfair competition charges were dismissed when the injunction issued is relevant in that there was no valid complaint on which to base a preliminary injunction. (See *Watson* v. *Santa Carmelita etc. Co.* (1943) 58 Cal.App.2d 709, 719 [137 P.2d 757]; *Moreno Mut. Irr. Co.* v. *Beamont Irr. Dist.* (1949) 94 Cal.App.2d 766, 778 [211 P.2d 928].) However, we do not rest our decision solely on this basis. We cannot ignore the inconsistency between KGB's initial inability to so much as state a cause of action in unfair competition or servicemark infringement, on the one hand, and the trial court's finding, on the other, of sufficient evidence to warrant a preliminary injunction based on those theories, all this in the face of the heavy burden which KGB must sustain to warrant enjoining Giannoulas from performing.

KGB argues the preliminary injunction best preserves the status quo, citing *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889]. It cannot be preserved. Giannoulas no longer works for KGB. The status quo has never been a situation where Giannoulas was not entitled to wear any chicken suit or ensemble.

Subsection (c) of paragraph (1) of the injunction preventing appearances in "any design substantially similar" to the KGB Chicken costume, is presumptively void because it is too uncertain to be a valid conduct regulation, whose violation may produce criminal sanctions. (*Pitchess* v. *Superior Court* (1969) 2 Cal.App.3d 644, 651 [83 Cal.Rptr. 41]; *People* v. *Gordon* (1951) 105 Cal.App.2d 711, 725 [234 P.2d 287].) Such a broad restraint invites continual litigation and casts the constant shadow of possible criminal prosecution over Giannoulas' entertainment routines,[5] impermissibly abridging his First Amendment freedoms which we have already discussed.

The injunction goes beyond authorizing law and is against public policy because it restricts Giannoulas' right to earn his living and to ex-

[5]Indeed, at this time Giannoulas has had to defend himself against contempt charges brought by KGB for alleged violation of paragraph (1) even though he does not wear the KGB insignia.

press his talents. Although subsections (a) and (b) of paragraph (1) of the injunction, referring to appearances in the defined KGB Chicken costume may stand, the remainder of the injunction is stayed pending the appeal of this matter.

Cologne, J., and Staniforth, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 16, 1980.