113 Cal.Rptr.2d 737 (2001)
93 Cal.App.4th 1213
Anita WALIA, Plaintiff and Respondent,
v.
AETNA, INC., et al., Defendants and Appellants.
No. A091221.
Court of Appeal, First District, Division Two.
November 21, 2001.
Review Granted February 27, 2002.
*739 John J. Swenson, Marcy Shaffer, Georgiana G. Rodiger, Tanya M. Acker, Los Angeles, Gibson, Dunn & Crutcher LLP, Attorneys for Appellants.
Richard S. Weil, San Francisco, Bley & Bley, Alan B. Exelrod, Patrice L. Goldman, San Francisco, Rudy, Exelrod & Zieff LLP, Attorneys for Respondent.
Certified for Partial Publication.[*]
*738 HAERLE, J.

I. INTRODUCTION
Appellants Aetna, Inc., Aetna U.S. Healthcare Inc. and Aetna U.S. Healthcare of California, Inc. (Aetna) challenge a jury verdict awarding compensatory and punitive damages to Aetna's former employee, Anita Walia (Walia). Aetna contends the trial court erred in ruling the non-compete agreement it required Walia to sign violated Business and Professions Code section 16600 [1] and instructing the jury that Aetna's decision to terminate Walia because she refused to sign the agreement was a wrongful termination in violation of public policy. Aetna also makes various challenges to the propriety of awarding Walia compensatory and punitive damages. We affirm the judgment.

II. FACTUAL AND PROCEDURAL BACKGROUND
In the summer of 1996, Aetna merged with U.S. Healthcare to form a company called Aetna U.S. Healthcare. U.S. Healthcare, a company headquartered in Pennsylvania and operating principally on the East Coast, used non-compete agreements extensively among its employees. Aetna, however, did not. Aetna U.S. Healthcare's co-president, Michael Cardillo, who came to the newly merged company from U.S. Healthcare, believed it was important to require that a significant number of Aetna's employees sign noncompete agreements.
The agreement was formally entitled "Non-Compete and Confidentiality Agreement" (the Agreement). It contained four paragraphs, each of which involved a different "covenant": a non-compete covenant, a non-solicitation covenant, a confidentiality covenant, and a cooperation covenant. The non-compete covenant prevented employees, for a period of six months after departing from Aetna, from working for a competitor in the same state in which they had been employed by Aetna. It also permitted the company to sue California employees for a perceived breach of the agreement in either Pennsylvania or Connecticut.[2]
*740 The Agreement was presented to Aetna U.S. Healthcare employees all over the country. In late March or early April 1997, Aetna informed approximately 300 of its California employees that they would be required to sign the Agreement. The company also told its employees they would lose their jobs if they did not sign the Agreement and could not locate a comparable position within the company that did not require the employee to sign such an agreement.
Walia, an Account Manager in the San Francisco sales organization for Aetna, was one of the employees required to sign the Agreement. When Walia received the Agreement, she was surprised at the harshness of some of the terms. Although she has never practiced law, Walia is a law school graduate. She turned to the Internet to obtain information about non-compete agreements. There she found an article warning California employees about a California statute prohibiting these kinds of agreements. She also researched California and Pennsylvania law on this subject at a law library. She determined the Agreement was "pretty much unenforceable in California."
At this point in her career, Walia enjoyed her job, liked the people she worked with, and had been rated as having "very good" job performance. She believed she had finally found a job she really liked. She felt "blindsided" by the Agreement and was upset and angry about it. She could not understand why Aetna would ask her to sign an unlawful contract. She seemed to be in a no-win situation: she could sign the contract and "lie to herself' or refuse to sign it and lose her job.
Walia spoke to four Aetna managers at increasing levels of seniority about her view that the Agreement was not legally enforceable: her supervisor, the San Francisco district office manager, the California Regional Manager and the Western Regional Manager. The San Francisco district office manager, Richard Keane, told her California law did not matter because the Agreement would be interpreted according to Pennsylvania law. Paul Swenson, the California regional manager, repeated this point to Walia. He also said the Agreement was needed to protect trade secrets, although he admitted he was not sure if Walia had access to any trade secrets. Walia said she would sign the Agreement if Aetna removed the non-compete covenant. The company did not do so.
Walia also spoke to Tom Williams, Aetna's Western Regional Manager. She told him she had done legal research about the non-compete and had "grave concerns about the agreement." She told Williams she would sign the Agreement if the covenant not to compete were removed. Walia also had a lawyer, Michael Connell, write to Michael Cardillo, Aetna's president. In a letter dated June 11, 1997, Connell informed *741 Cardillo that, under section 16600, covenants not to compete are unenforceable in California and terminations or demotions of employees for their refusal to sign such covenants would expose Aetna to liability for wrongful termination in violation of public policy and punitive damages.
Aetna responded that it believed the Agreement complied with California law. Aetna also discussed with Walia the possibility of becoming an underwriter, a position Walia was not interested in because she did not like working with numbers and was not confident about her ability to do financial analysis. Underwriters also did not have sufficient interaction with people, something she particularly liked about her sales job.
On June 27, 1997, Aetna fired Walia for "failure to meet the requirements of your position." A letter to this effect was placed in Walia's personnel file. When Walia read this letter she felt betrayed: she had been consistently told she was doing a good job and the letter implied this was not true.
The Agreement was discussed and approved by Aetna, Inc.'s Chairman and, within Aetna U.S. Healthcare, by its copresidents. Aetna U.S. Healthcare employees, including the company's president, Michael Cardillo, testified they believed they were in compliance with California law because they had been assured this was the case by their legal counsel.
Donald Liu, an attorney who, before the merger, had been employed by U.S. Healthcare, had the lead role in providing legal advice on the Agreement. Liu was aware that employees in California had objected to the Agreement and believed it was not enforceable in California. He was also aware of section 16600, possibly prior to receiving the letter from Connell objecting to the Agreement. There were also lawyers in U.S. Healthcare's legal department who were familiar with California law. Liu testified that how long a person had worked at Aetna and the quality of that person's performance was not relevant to a decision to terminate the employee if the employee refused to sign the noncompete. Apparently in response to an email asking whether the non-compete interfered with an employee's livelihood, Liu conceded that he had most likely drafted this reply: "`Livelihood' means what it says. It means they starve to death with the non-compete. No human being could possibly lose their livelihood with a noncompete."
Wayne Slitt, an Aetna attorney familiar with employment law, testified that he had some discussions with lawyers about "some of the legal issues related to non-competes, but my role was quite limited." Prior to June 30, 1997, Slitt performed no research on the subject of non-competes and most of the questions he received on this subject were of a general nature. He testified that he was aware different states had different rules regarding various employment laws. Slitt saw the June 11, 1997, letter from Michael Connell, Walia's attorney, to Michael Cardillo. Slitt prepared the response to Connell, which stated "Aetna certainly believes in the validity and enforceability of all of its contractual terms, including paragraphs one and two (limited and qualified association with a competitor)."
Slitt also wrote an e-mail dated February 12, 1996, in which he responded to a suggestion that the company have a broader group of employees sign non-competes. In this e-mail, he wrote: "While non-competes are not permitted in some states, generally they are enforceable if they are reasonable." He also wrote, "In short, non-compete agreements have some benefit, but they are not a panacea and they can create other problems." At the time *742 he wrote this e-mail, he was aware that a non-compete agreement that was enforceable in one state might not be enforceable in another.
Other than Liu and Slitt, no other attorney testified on Aetna's behalf.
Aetna witnesses testified they believed the Agreement would prevent former employees from disclosing confidential information. Aetna had not, however, previously had any problems with former employees disclosing confidential or proprietary information to competitors, disclosing trade secrets or soliciting employees to work for a competitor. In addition, Aetna employees had been required to sign a "Code of Conduct" before the merger which, among other things, prohibited employees from disclosing confidential information. Aetna also anticipated employee turnover after the merger and, through the non-compete agreements, wanted to send a message to competitors that they could not "raid" or "cherry-pick" Aetna employees.
The trial court ruled that, as a matter of law, the Agreement violated section 16600. The court also instructed the jury that the defendants would be liable for wrongful termination if the principal reason for Walla's termination was her refusal to sign the Agreement as opposed to her refusal to accept a comparable job at the company. The jury found Walia was terminated for refusing to sign the Agreement. It awarded her $54,312 in compensatory damages, $125,000 in emotional distress damages and $1,080,000 in punitive damages. Aetna unsuccessfully moved for a new trial and this timely appeal followed.

III. DISCUSSION

A. Section 16600

Aetna argues the trial court erred in ruling the Agreement violates section 16600. We disagree.
Neither party disputes that we review this question under the de novo standard of review. With two inapplicable exceptions,[3] section 16600 provides "[E]very contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Section 16600 has been the law in California since 1872. It represents the "strong public policy of the State of California" that "the interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers." (Application Group, Inc. v. Hunter Group, Inc., (1998) 61 Cal.App.4th 881, 900, 72 Cal.Rptr.2d 73; Metro Traffic Control, Inc. v. Shadow Traffic Network (1994) 22 Cal.App.4th 853, 859, 27 Cal.Rptr.2d 573 (Metro Traffic) ["California courts have consistently declared this provision an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice"]; KGB, Inc. v. Giannoulas (1980) 104 Cal.App.3d 844, 848, 164 Cal. Rptr. 571 ["This statute presents an absolute bar to post-employment restraints and represents a strong public policy of this state (Golden State Linen Service, Inc. v. Vidalin (1977) 69 Cal.App.3d 1, 12-13, 137 Cal.Rptr. 807; Muggill v. Reuben H. Donnelley Corp. (1965) 62 Cal.2d 239, 242, 42 Cal.Rptr. 107, 398 P.2d 147 [Muggill]; Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1972) 24 Cal.App.3d 35, 43, 100 Cal.Rptr. 791)"].)
*743 Paragraph 1 of the Agreement prohibits current and former Aetna employees from working for "any competitor of the Company engaged in health care business...." The prohibition is for a period of six months and prevents an employee from working for any competitor in the same state in which the employee worked for Aetna or from working within a 50-mile radius of the sales territory the employee had previously covered for Aetna. This Agreement restricts Aetna's employees' "mobility and betterment" and violates section 16600.
Aetna contends the Agreement does not violate section 16600 because courts have permitted non-compete agreements when they only narrowly restrain competition. The Agreement, however, does not fall within this exception. The seminal California case regarding the "narrow restraint" exception is Boughton v. Socony Mobil Oil Co., Inc. (1964) 231 Cal.App.2d 188, 41 Cal.Rptr. 714 (Boughton), a case which involved a provision quite different from the one in the Aetna Agreement. In Boughton, the challenged restriction was contained in language in a deed to the plaintiffs property. This language prohibited the plaintiff from using the property for dispensing petroleum products for 20 years. The court held the deed did not violate section 16600 because "[t]he single restriction is imposed, not personally on plaintiffs restraining them from engaging or carrying on any profession, trade or business but, on the use of the land upon which they as grantees are barred merely from selling petroleum products, and then only for a limited period of time. Moreover, under this restriction the grantees are not prevented from dispensing petroleum products and operating a service station at any time at any other place and there directly competing with defendant." (Id. at pp. 190-191, 41 Cal.Rptr. 714.)
The court went on to note that restrictions on pursuing "only a small or limited part of a business, trade or profession" would not run afoul of section 16600. (Boughton, supra, 231 Cal.App.2d at p. 192, 41 Cal.Rptr. 714.) It pointed to an earlier case, King v. Ceroid (1952) 109 Cal.App.2d 316, 240 P.2d 710 (King), as an example of a "small or limited" restriction. In King, "plaintiff, inventor and designer of a house trailer, agreed to give defendant a license to manufacture it for certain royalties; the contract provided that if there was no renewal at the end of six months defendant would cease to manufacture the trailer." (Boughton, supra, 231 Cal. App.2d at p. 192, 41 Cal.Rptr. 714.) The court found this agreement did not violate section 16600 because "`[a]ppellant is not ... prohibited from carrying on his lawful business of manufacturing trailers but is barred merely from manufacturing and selling trailers of the particular design and style invented by respondent who in the first instance licensed appellant to use such design for a limited time only.'" (Id. at pp. 192-193, 41 Cal.Rptr. 714.) Here, in contrast, Walia was required to agree that she would not accept a job as a salesperson for any health care company in the state of California. This broad restriction is quite different from the narrowly tailored restrictions exemplified by Boughton and King.
Federal courts, construing California law, have also considered this issue. In General Commercial Packaging, Inc. v. TPS Package Engineering, Inc. (9th Cir. 1997) 126 F.3d 1131, a packing and shipping company, General Commercial Packaging, Inc. (GCP), subcontracted with another such company, TPS Package Engineering, to do some work for GCP's customer, the Walt Disney Company. GCP asked TPS to sign a contract barring TPS from working directly for or soliciting the Walt Disney Company *744 for a period of one year. The court concluded this contract did not violate section 16600 because it "only limits TPS's access to a narrow segment of the packing and shipping market." (Id. at p. 1134.) In contrast, the Agreement prohibits Walia from working for any of Aetna's competitors in a very broadly defined market, one encompassing all health insurance providers.
Most on point in considering whether the Agreement only narrowly restrains competition is, for obvious reasons, Latona v. Aetna U.S. Healthcare, Inc. (C.D.Cal. 1999) 82 F.Supp.2d 1089 (Latona). The Latona court rejected the same narrow restraint argument made here with regard to a non-compete agreement identical to the one in this case. The Latona court concluded "[a]n examination of the Agreement's wording shows that it does not qualify for this [narrow restraint] exception. At a minimum, by its terms, paragraph 1 of the Agreement purports to prevent Aetna employees from leaving to work for another health maintenance organization (HMO), preferred provider organization (PPO), or point of service plan (POS),or any hospital, medical practice, or academic institution that is an affiliate of such HMO, PPO, or POSfor a period of six months, unless her new responsibilities exclude the very area in which she has been working and living. If plaintiff wanted to remain in the health care industry and aimed to comply with the Agreement's restrictions, she would have to take a job at least 50 miles outside of San Bernardino County, Riverside County, and parts of Los Angeles County, or move out of state (if she were to stay in the health care industry). Defendant notes that the geographic restrictions would not apply if plaintiff took a job with an entity that did not meet the agreement's definition of a `competitor,' but the set of entities in the health care field excluded by the Agreement's definition is rather narrow. With the increasing prevalence of HMOs in the medical industry, the set of entities excluded by this definition is shrinking rapidly." (Id. at pp. 1094-1095.)
The cases we discuss here stand for the proposition that contractual limitations on the pursuit of a profession or business, which only restrict an employee from pursuing his or her profession in a minor part of the market, might be enforceable. Otherwise, the agreements cannot stand. We concur with the Latona court that the agreement used by Aetna did not place a minor restriction on Walia. The agreement Walia was required to sign prohibited her, with a few exceptions, from working as a salesperson for most employers in the health care industry. This broad restriction violates section 16600.
Aetna argues that International Business Machines Corp. v. Bajorek (9th Cir. 1999) 191 F.3d 1033, 1040 (IBM), suggests otherwise. In IBM, the Ninth Circuit considered an agreement that required an employee who worked for a competitor within six months after leaving IBM to return stock option profits. The court ruled this agreement did not violate section 16600. The court seemed aware that California authority was contrary to its conclusion, but felt itself bound by the circuit's prior interpretations of California law. (Id. at p. 1041 ["We are not free to read California law without deferring to our own precedent on how to construe it"].) IBM, in fact, is contrary to California law because it is contradicted by Muggill, supra, 62 Cal.2d 239, 42 Cal.Rptr. 107, 398 P.2d 147. In Muggill, the California Supreme Court held that an agreement requiring an employee to forfeit pension rights if he went to work for a competitor "restrains him from engaging in a lawful business and is therefore void." (Id. at p. 243.) Muggill, therefore, represents the *745 long-held California view that an agreement that financially penalizes an employee who goes to work for a competitor is unlawful under section 16600 and thus contradicts IBM.
Aetna also argues the Agreement does not violate section 16600 because the covenant not to compete was necessary to protect Aetna's trade secrets. Again, we disagree. In an early case concerning this "trade secrets" exception to section 16600, the California Supreme Court considered whether an agreement prohibiting a "weekly credit" salesperson from divulging the names of former customers to a subsequent employer or from soliciting those customers violated section 16600. The court concluded it did not, because the agreement "did not prevent defendant from carrying on a weekly credit business or any other business. He merely agreed not to use plaintiffs' confidential lists to solicit customers for himself for a period of one year following termination of his employment. Such an agreement is valid and enforceable." (Gordon v. Landau (1958) 49 Cal.2d 690, 694, 321 P.2d 456 (Gordon ).) In contrast, the Agreement's noncompete provision makes no reference to trade secrets possessed by Walia and prevents Walia from being a salesperson in her chosen field. The Agreement does, in fact, contain a paragraphentirely separate from the disputed non-compete clausethat specifically addresses trade secrets. The presence of this provision in the Agreement belies Aetna's claim that the non-compete must be seen as a necessary measure to protect trade secrets. Aetna has already availed itself of a means of protecting its trade secrets. Finally, although certain management personnel at Aetna may have been of the opinion that the non-compete would prevent employees from divulging confidential information to subsequent employers, this conviction does not convert this patently illegal agreement into an enforceable agreement to protect trade secrets.
Aetna's final argument is that the non-compete covenant does not violate section 16600 because it was severable from the rest of the Agreement. This argument was rejected by the court in Latona, supra, 82 F.Supp.2d at page 1097, a decision with which we agree. The Latona court concluded: "[T]he contract was never signed, [plaintiff] enjoyed no benefit from it, and Aetna never sought to enforce it against her. The case presents a wholly different issue: whether an employer may fire an employee for refusing to sign an agreement containing provisions in direct violation of public policy, then escape liability for wrongful termination on the grounds that other provisions of the agreement were inoffensive. The answer is clearly no. As the Kolani [v. Gluska (1998) 64 Cal.App.4th 402], 75 Cal.Rptr.2d 257 court recognized, [T]he policy of section 16600 would be undermined by [allowing such behavior]. Employers could insert broad, facially illegal covenants not to compete in their employment contracts. Many, perhaps most, employees would honor these clauses without consulting counsel or challenging the clause in court, thus directly undermining the statutory policy favoring competition. Employers would have no disincentive to use the broad, illegal clauses if permitted to retreat to a narrow, lawful construction in the event of litigation. [Citation.] [¶] ... Aetna cannot now be relieved of liability for a wrongful termination on the ground that if it had excised the offensive portions of the Agreement, plaintiff would have had no grounds to object to signing it." (Latona, supra, 82 F.Supp.2d at p. 1097.)

B. Public Policy Violation

Aetna contends that, even if the Agreement violates section 16600, Walia's termination *746 for refusing to sign it does not violate public policy because any such policy was "neither articulated at the time of her discharge nor fundamental and substantial." Aetna argues that, therefore, the trial court erred in ruling, as a matter of law, that "[t]he termination of Plaintiff for her refusal to sign the [Agreement] would constitute a violation of a fundamental public policy, giving rise to a Tameny cause of action."[4]
We disagree. In general, an employer who discharges an employee for refusing to do something public policy condemns may be subject to a wrongful termination claim. (Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167, 164 Cal. Rptr. 839, 610 P.2d 1330 (Tameny); Gantt v. Sentry Insurance (1992) 1 Cal.4th 1083, 1100, 4 Cal.Rptr.2d 874, 824 P.2d 680 ["The obligation to refrain from ... conduct [that violates public policy] is a `duty imposed by law upon all employers to implement the fundamental public policies' of the state [citation]; it cannot be bargained away [citation] ..."].) In order to prevail on a Tameny claim, an employee must satisfy four requirements: "First, the policy must be supported by either constitutional or statutory provisions. Second, the policy must be `public' in the sense that it `inures to the benefit of the public' rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge. Fourth, the policy must be `fundamental' and `substantial.'" (Stevenson v. Superior Court (1997) 16 Cal.4th 880, 889-890, 66 Cal.Rptr.2d 888, 941 P.2d 1157.)
Aetna argues that the last two requirements are not met in this matter. We cannot agree. The policy against noncompete agreements has existed in California since 1872, when the prohibition against these types of agreements was first enacted. Many courts since that time have reaffirmed the existence of a policy against such agreements. (Metro Traffic, supra, 22 Cal.App.4th at p. 859, 27 Cal. Rptr.2d 573; Application Group, Inc. v. Hunter Group, Inc., supra, 61 Cal.App.4th at p. 900, 72 Cal.Rptr.2d 73; KGB, Inc. v. Giannoulas, supra, 104 Cal.App.3d at p. 848, 164 Cal.Rptr. 571; Golden State Linen Service, Inc. v. Vidalin, supra, 69 Cal. App.3d at pp. 12-13, 137 Cal.Rptr. 807; Muggill, supra, 62 Cal.2d at p. 242, 42 Cal.Rptr. 107, 398 P.2d 147; Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 24 Cal.App.3d at p. 43, 100 Cal. Rptr. 791.) Thus, as our colleagues in Division Three of this district recently noted, "section 16600 reflects a `strong public policy' of the State of California." (Application Group, Inc. v. Hunter Group, Inc., supra, 61 Cal.App.4th at p. 900, 72 Cal. Rptr.2d 73.) In Cerberonics, Inc. v. Unemployment Ins. Appeals Bd. (1984) 152 Cal.App.3d 172, 177, 199 Cal.Rptr. 292, the court concluded that "[restraining an individual from seeking employment elsewhere violates ... public policy and constitutes an unreasonable burden on the employee. [¶] ... Seeking a market for one's skills is the only way to guarantee continued employment or achieve advancement. It is a means of obtaining better working conditions, higher pay or more secure tenure, and is an appropriate aim for any working person. It is a reasonable and expected career enhancement objective." Certainly, *747 then, the fundamental policy set forth in section 16600 was articulated at the time of Walia's discharge.
Aetna, however, contends there was some question about the enforceability of this particular non-compete agreement. Therefore, firing an employee who refused to sign it could not be the basis for a Tameny claim because Aetna did not have notice that the agreement would violate section 16600. This theory is unconvincing. There is nothing about the non-compete clause in the Agreement that sets it apart from other non-compete agreements found to violate section 16600. For example, the non-compete agreement found unenforceable in Metro Traffic, supra, 22 Cal.App.4th at p. 856, fn. 1, 27 Cal.Rptr.2d 573, is quite similar to the non-compete agreement in this case: the Metro Traffic covenant restrained employees who worked as traffic reporters from performing this same job in the geographic area in which they currently worked for a period of one year. Here, Walia was prevented from working as a salesperson in the health care industry in the geographic area in which she worked for Aetna for six months. The Metro Traffic court had little difficulty in concluding the agreement in that case violated section 16600; the same is true here.
Aetna cites Lagatree v. Luce, Forward, Hamilton & Scripps (1999) 74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664 (Lagatree) and contends it did not have adequate notice that the non-compete provision violated public policy because, at the time it required Walia to sign the agreement, "no California case law, statute or regulation prohibited the conduct here at issue." Lagatree, however, is of no assistance to Aetna because it involved employer conduct that did not violate any statutorily or constitutionally articulated public policy. In Lagatree, an employee was required to sign an agreement to arbitrate work-related disputes. The employee refused and was fired. No statute explicitly applied to the disputed agreement. Plaintiff instead argued that, because one federal court had found certain aspects of the agreement unenforceable, this ruling created a public policy against such agreements for Tameny purposes. The Lagatree court pointed out that many other courts, including those in California, had come to a contrary conclusion and went on to say: "[W]e question whether [the single federal case]a nonbinding decision from another jurisdictioncould support a well established public policy under California law." (Lagatree, supra, 74 Cal.App.4th at p. 1134, 88 Cal.Rptr.2d 664.) The court then concluded: "So, we state the obvious.... [A] rule of law announced in one case may be modified, limited or distinguished in later cases. For our purposes, it is sufficient to point out that the holding in Cole would not support a public policy claim against [defendant.]" (Id. at p. 1135, 88 Cal.Rptr.2d 664.)
Here, in striking contrast, the rule of law with which we are dealing is explicitly set out in a statute that has been in existence in California for over one hundred years and has a substantial history of court enforcement over that period. Aetna's citation to three unpublished federal district court orders from the Central District of California and an unpublished summary denial of a writ petition by the Second Appellate District (all of which were issued after Walia's termination) does not convince us otherwise. These documents do not, as Aetna contends, demonstrate that the public policy against non-compete provisions was not articulated at the time of Walia's discharge because defendants in other cases challenging non-compete agreements were able to secure dismissals of Tameny claims. We are not swayed by these references to summary, unpublished *748 material from other courts, issued after Walia's termination, particularly where, as here, there is an array of carefully considered, published decisions to the contrary.[5]
Nor do we agree with Aetna's suggestion that these decisions somehow demonstrate that, when it required its employees sign the Agreement, the law was in a state of confusion about whether section 16600 represents a fundamental public policy. The state of the law in 1997, when Walia was terminated, and in 2001, when we consider this issue, is consistent: section 16600 represents the public policy of the State of California. We reject, therefore, Aetna's arguments that the trial court erred in instructing the jury on section 16600 and in granting a motion in limine requesting a ruling as a matter of law that the termination of Walia for her refusal to sign the non-compete agreement would constitute a public policy violation giving rise to a Tameny action were in error. In sum, California public policy condemns non-compete agreements. Walia was presented with one, she refused to sign it and, as a consequence of this refusal, she was fired. A Tameny claim occurs when an employer discharges an employee for refusing to do something that public policy condemns. (Gantt v. Sentry Insurance, supra, 1 Cal.4th at p. 1090, 4 Cal. Rptr.2d 874, 824 P.2d 680.) The trial court, therefore, properly instructed the jury on Walia's Tameny claim.

C.-E.[**]

IV. DISPOSITION
The judgment is affirmed.
We concur: KLINE, P.J. and RUVOLO, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III C, D and E.
[1] All further statutory references are to the Business and Professions Code, unless otherwise indicated.
[2] Paragraph 1 of the Agreement contains the non-compete agreement: "I covenant and agree that so long as I am employed with the Company and for a period of six months after ... the termination of my employment with the Company ... I shall not ... become an employee of or ... act as a consultant or contractor to, any competitor of the Company engaged in health care business (`Competitor'). Notwithstanding the foregoing, nothing in this agreement shall prohibit me from becoming (i) an employee of an independent and separate subsidiary or division of a Competitor if I do not engage in any business activity of the Competitor that is competitive to any aspect of the Company's health care businesses; (ii) an employee of a Competitor if the Competitor's office from which 1 will work is not located within the state in which the Company maintains an office which engages in health care business and from which I worked as an employee of the Company at any time during the 24 month period immediately prior to the date of termination of my employment with the Company; or (iii) an employee of a Competitor if I do not have any responsibility for or significant involvement with any area which is within a Restricted Area (as defined below) or within 50 miles thereof. As used in this Agreement, `Restricted Area' means any Aetna U.S. Healthcare area over which or in which I had responsibility or significant involvement during the 24 month period immediately prior to the date of termination of my employment with the Company. As used herein, a competitor does not include any hospital, private medical practice or academic institution that does not own or operate (directly or indirectly), and is not otherwise an affiliate of, a health insurance company, a managed care company or a health benefit plant (including an HMO, POS or PPO plan)."
[3] The buyer of an existing business may require that the seller not compete with the buyer (§ 16601) and a partnership may prevent a departing partner from competing after the partnership dissolves (§ 16602).
[4] The court instructed the jury that "[I]f the plaintiff's refusal to sign the noncompete agreement was the principal reason for her termination, then the termination violates or violated public policy. If, on the other hand, her refusal to accept another comparable position was the principal reason for her termination, then the termination does not or did not violate public policy."
[5] Aetna also contends the trial court erred in granting Walia's motion in limine to preclude reference to federal court rulings on Aetna's non-compete agreement on section 352 grounds. The trial court permitted "the introduction of any decisions that came down prior to the point of termination, but decisions that were made after the point of termination I did not feel were relevant." The trial court also found that, in general, exposing the jury to legal opinions would "open up a number of problems under Section 352, explaining the other decisions, talking about still other decisions which the plaintiff might want to bring out that other courts had reached which are consistent with my own decisions, and just getting into that, I thought, really could be opening Pandora's box. [¶] So because I didn't believe the subject matter was relevant in the first place or that it's relevant only marginally so, I drew the lines that I did and which are reflected in the record." We conclude that the trial court did not abuse its discretion in so ruling.
[**] See footnote *, ante.