[No. B124263. Second Dist., Div. One. Sept. 13, 1999.]

DONALD LAGATREE, Plaintiff and Appellant, v.
LUCE, FORWARD, HAMILTON & SCRIPPS LLP, Defendant and
Respondent.

[No. B125272. Second Dist., Div. One. Sept. 13, 1999.]

DONALD LAGATREE, Plaintiff and Appellant, v.
KEESAL, YOUNG & LOGAN, Defendant and Respondent.

**COUNSEL**

ACLU Foundation of Southern California, David S. Schwartz and Mark D. Rosenbaum for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps, Charles A. Bird and Kelly Capen Douglas for Defendant and Respondent Luce, Forward, Hamilton & Scripps.

Keesal, Young & Logan, Ben R. Suter, Dawn M. Schock and Lisa M. Bertain for Defendant and Respondent Keesal, Young & Logan.

Sidley & Austin, Jeffrey A. Berman and Octavio A. Pedroza for Employers Group as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**MASTERSON J.**—This appeal presents the question of whether an employee can state a cause of action for wrongful termination in violation of public policy where he was discharged in 1997 for refusing to sign a predispute arbitration agreement requiring that work-related disputes be resolved through binding arbitration. We conclude that the termination did not violate public policy.

### BACKGROUND

In September 1993, plaintiff Donald Lagatree, a legal secretary, commenced temporary employment with the law firm of Keesal, Young & Logan (Keesal Young) in Long Beach. On March 14, 1994, Lagatree became a full-time employee of the firm. Throughout his employment with Keesal Young, Lagatree's job performance was rated satisfactory or better. He received pay raises and bonuses.

In early June 1997, Keesal Young asked Lagatree to sign an arbitration agreement, which stated: "I agree that any claims arising out of or relating to my employment or the termination of my employment with Keesal, Young & Logan ('KY&L') that KY&L may have against me or that I may have against KY&L or its present or former employees or agents shall be resolved by final and binding arbitration . . . . Notwithstanding the above, I understand that I am not required to arbitrate the following claims: discrimination claims, wage and hour claims, and other related statutory claims." The agreement provided that disputes would be heard by a panel of three retired superior court judges and that the arbitration would be conducted pursuant to the commercial arbitration rules of the American Arbitration Association. The agreement also provided that "the entire cost of the arbitration, including legal fees, shall be borne by the losing party."

Lagatree informed Keesal Young's managing partner that he did not want to submit disputes to arbitration. On or about June 30, 1997, Lagatree was discharged for refusing to sign the agreement.

Lagatree searched for another secretarial job. On September 12, 1997, he was offered a full-time position at the law firm of Luce, Forward, Hamilton & Scripps LLP (Luce Forward). He accepted the offer. On September 16, 1997, Lagatree reported to Luce Forward's Los Angeles office for his first day of work. Later that day, Lagatree was given a "Letter of Employment," which purported to "confirm[] our offer of employment to you in the position as a non-exempt legal secretary . . . , should you accept." The

letter further stated: "In the event of any dispute or claim between you and the firm (including employees, partners, agents, successors and assigns), including, but not limited to claims arising from or related to your employment or the termination of your employment, we jointly agree to submit all such disputes or claims to confidential binding arbitration, under the Federal Arbitration Act."

On September 18, 1997, his third day at Luce Forward, Lagatree told his superiors that he would not agree to arbitrate disputes. Lagatree was advised that the arbitration provision was "not negotiable" and that his continued employment was contingent upon signing the agreement. Lagatree declined to sign the agreement and was discharged.

On February 13, 1998, Lagatree filed separate actions against Keesal Young and Luce Forward. Both complaints alleged that Lagatree had been terminated in violation of public policy for refusing to waive his constitutional rights to a jury trial and a judicial forum (U.S. Const., 1st & 7th Amends.; Cal. Const., art. I, §§ 3, 16). Lagatree also alleged that his discharge violated the California Unfair Competition Law (Bus. & Prof. Code, §§ 17200-17209)[1] and Civil Code section 1668.[2] The law firms demurred to the complaints, arguing that an employer does not violate public policy by discharging employees who refuse to sign a predispute arbitration agreement as a condition of employment. The demurrers were sustained without leave to amend. Lagatree filed timely appeals from the dismissals. We ordered the cases consolidated for purposes of appeal.[3]

### DISCUSSION

■ In reviewing the ruling on a demurrer, "we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . .

---

[1]"Section 17200 of the Business and Professions Code broadly defines 'unfair competition' as, inter alia, any 'unlawful, unfair or fraudulent business [act or] practice . . . .' 'Unlawful business activity' proscribed under section 17200 includes ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' . . . '[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder.' " (*Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730].)

[2]Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

[3]Lagatree is represented by the same counsel in both cases. Because of differences in their procedural history, the cases were separately briefed on appeal.

We also consider matters which may be judicially noticed.' . . . Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. . . . When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. . . . And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. . . . The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58], citations omitted.)

## A. *Overview of Wrongful Termination Law*

█ "Labor Code section 2922 provides in relevant part, 'An employment, having no specified term, may be terminated at the will of either party on notice to the other. . . .' This presumption may be superseded by a contract, express or implied, limiting the employer's right to discharge the employee. . . . Absent any contract, however, the employment is 'at will,' and the employee can be fired with or without good cause. But the employer's right to discharge an 'at will' employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal." (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 665 [254 Cal.Rptr. 211, 765 P.2d 373], citations and fn. omitted (*Foley*).) "Accordingly, while an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1094 [4 Cal.Rptr.2d 874, 824 P.2d 680], overruled on other grounds in *Green* v. *Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6 [78 Cal.Rptr.2d 16, 960 P.2d 1046].)[4]

█ Our Supreme Court "[has] established a set of requirements that a policy must satisfy to support a tortious discharge claim. First, the policy must be supported by either constitutional or statutory provisions [or regulations enacted under statutory authority]. Second, the policy must be 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge. Fourth, the policy must be 'fundamental' and 'substantial.' " (*Stevenson* v. *Superior Court* (1997) 16 Cal.4th 880, 889-890 [66 Cal.Rptr.2d 888, 941 P.2d 1157]; see *Green* v. *Ralee Engineering Co., supra,* 19 Cal.4th at pp. 75-76, 79-80, 89-90.)

---

[4]Lagatree does not dispute that he was an at-will employee.

"The cases in which California courts have recognized a separate tort cause of action for wrongful termination in violation of public policy generally fall into four categories, where the employee is discharged for: (1) refusal to violate a statute . . . ; (2) performing a statutory obligation . . . ; (3) exercising (or refusing to waive) a statutory or constitutional right or privilege . . . ; or (4) reporting an alleged violation of a statute of public importance . . . ." (*Pettus* v. *Cole* (1996) 49 Cal.App.4th 402, 454 [57 Cal.Rptr.2d 46], citations and fn. omitted; accord, *Green* v. *Ralee Engineering Co.*, *supra*, 19 Cal.4th at p. 76.)

" 'Yet despite its broad acceptance, the principle underlying the public policy exception is more easily stated than applied. The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee.' " (*Stevenson* v. *Superior Court*, *supra*, 16 Cal.4th at p. 889.) Unfortunately, " '[t]he term "public policy" is inherently not subject to precise definition. . . .' " (*Gantt* v. *Sentry Insurance*, *supra*, 1 Cal.4th at p. 1094.) Thus, ". . . it is generally agreed that . . . courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy . . . .' . . . [C]ourts 'should proceed cautiously' if called upon to declare public policy absent some prior legislative expression on the subject." (*Id.* at p. 1095.)

A claim of wrongful termination in violation of public policy must be based on a "substantial public" policy. (See *Green* v. *Ralee Engineering Co.*, *supra*, 19 Cal.4th at pp. 75-76, 89-90.) In determining whether such a policy has been violated, the courts consider whether an employer and employee could circumvent the policy by way of agreement. Plainly, not all of an employer's duties nor all of an employee's rights "inure to the benefit of the public at large rather than to a particular employer or employee." (*Foley*, *supra*, 47 Cal.3d at p. 669.) The fact that a duty or right can be modified or waived by agreement suggests that it does not confer a substantial benefit on the public.

In *Foley*, *supra*, 47 Cal.3d 654, the plaintiff learned that his immediate supervisor was being investigated by the Federal Bureau of Investigation for embezzlement in connection with his prior employment. The plaintiff told a company officer about the investigation. Shortly thereafter, the plaintiff was terminated. In his wrongful termination action, the plaintiff asserted that his discharge violated the "public policy that imposes a legal duty on employees to report relevant business information to management." (*Id.* at p. 669.) The Supreme Court disagreed, finding that the plaintiff's termination did not

violate a substantial public policy. (*Id.* at p. 670.) As the court explained in footnote 12 of its opinion: "The absence of a distinctly 'public' interest in this case is apparent when we consider that if an employer and employee were *expressly* to agree that the employee has no obligation to, and should not, inform the employer of any adverse information the employee learns about a fellow employee's background, nothing in the state's public policy would render such an agreement void. By contrast, in the previous cases asserting a discharge in violation of public policy, the public interest at stake was invariably one which could not properly be circumvented by agreement of the parties. For example, in *Tameny*[ v. *Atlantic Richfield Co.* (1980)] 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314], a contract provision purporting to obligate the employee to comply with an order of the employer directing the employee to violate the antitrust laws would clearly have been void as against public policy, and in *Petermann* [v. *International Brotherhood of Teamsters* (1959)] 174 Cal.App.2d 184 [344 P.2d 25], a contract provision which purported to obligate the employee to commit perjury at the employer's behest would just as obviously have been invalid. Because here the employer and employee could have agreed that the employee had no duty to disclose such information, it cannot be said that an employer, in discharging an employee on this basis, violates a fundamental duty imposed on all employers for the protection of the public interest." (*Foley*, *supra*, 47 Cal.3d at p. 670, fn. 12, italics in original.)

Similarly, in *Gantt* v. *Sentry Insurance*, *supra*, 1 Cal.4th 1083, the court noted that "[t]he obligation to refrain from . . . conduct [that violates public policy] is a 'duty imposed by law upon all employers to implement the fundamental public policies' of the state . . . ; *it cannot be bargained away . . . .*" (*Id.* at p. 1100, citing *Foley*, *supra*, 47 Cal.3d at p. 670, fn. 12, italics added.)

More recently, in *Green* v. *Ralee Engineering Co.*, *supra*, 19 Cal.4th 66, the plaintiff, a quality control inspector for a manufacturer of aircraft parts, alleged that he had been discharged for complaining internally that his employer was shipping defective parts to aircraft assembly companies. Relying on footnote 12 in *Foley*, the employer argued that the employee's claim did not concern a public benefit or interest. (19 Cal.4th at p. 84.) The Supreme Court rejected that argument, stating: "The critical distinction between the facts here and those at issue in *Foley*, *supra*, 47 Cal.3d at pages 670-671, footnote 12, is that there the violations of internal practices affected only the employer's interest, while here defendant's alleged misconduct potentially jeopardized airline passenger safety. Protecting airline passengers, therefore, is the relevant fundamental public policy at issue. Promoting airline safety—the subject of the federal regulations—constitutes

a policy of sufficient public importance. As plaintiff points out, travel by any common carrier inevitably concerns the public, because a common carrier's mistake or a manufacturer's defective part can cause multiple casualties." (19 Cal.4th at p. 85.)

Post-*Foley* decisions of the Courts of Appeal have been faithful to the analysis in *Foley*'s footnote 12. In *Collier* v. *Superior Court* (1991) 228 Cal.App.3d 1117 [279 Cal.Rptr. 453], the plaintiff alleged that he had been discharged for notifying upper management that other employees were possibly engaged in illegal conduct on the job, including bribery, embezzlement, tax evasion, drug trafficking, and violations of federal antitrust laws. In holding that the employee had adequately pleaded a public policy claim, the court stated:

"The public nature of the interest at stake in this case becomes apparent under the hypothetical test suggested in the margin of the *Foley* decision. (47 Cal.3d at p. 670, fn. 12.) In explaining why there was no public interest in the case before it, the court [in *Foley*] noted that if an employer and employee expressly agreed that the employee had no obligation to, and should not, inform the employer of any adverse information the employee learned about a fellow employee's background, nothing in the state's public policy would render such an agreement void. . . . This is because the adverse information in *Foley* served only the employer's interest, not the public's interest, and thus there was no public interest at stake in preventing such report.

"That is a critical distinction between the facts alleged in *Foley* and those in this case. . . . [T]he burden of suspected misconduct in this case was not confined to the interests of the employer alone. An agreement prohibiting an employee from informing anyone in the employer's organization about reasonably based suspicions of ongoing criminal conduct by coworkers would be a disservice not only to the employer's interests, but also to the interests of the public and would therefore present serious public policy concerns not present in *Foley*." (*Collier* v. *Superior Court*, *supra*, 228 Cal.App.3d at pp. 1124-1125, followed in *Gould* v. *Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1149-1150 [37 Cal.Rptr.2d 718] [employer violates public policy by terminating employee for reporting to management that company was violating wage and hour laws].)

In *Holmes* v. *General Dynamics Corp.* (1993) 17 Cal.App.4th 1418 [22 Cal.Rptr.2d 172], the plaintiff, who worked for a defense contractor, informed his superiors that the company was overbilling the government. Despite a commendable work record, the plaintiff was discharged. He sued

for wrongful termination, alleging that he had been discharged for reporting violations of the federal False Statements Act (18 U.S.C. § 1001), which prohibits the making of knowingly false statements to any federal department or agency.

In affirming a jury verdict in the plaintiff's favor, the Court of Appeal acknowledged that, in *Foley*, ". . . the court explained [that] the absence of a substantial public interest was 'apparent' because the employer and employee could have properly agreed the employee should not inform the employer of any such adverse information about a co-employee's background. . . . Here, by contrast, it would be clearly improper for [the employer] to prohibit employees, particularly employees such as [the plaintiff,] whose job was to monitor contract performance, from reporting or disclosing suspected violations of governmental contracts." (17 Cal.App.4th at p. 1433.)

Finally, in a pair of cases addressing whether workplace drug-testing programs violate an employee's right of privacy under the state Constitution (Cal. Const., art. I, § 1), two Courts of Appeal, although reaching opposite conclusions, are noteworthy because they both applied the analysis set forth in *Foley*'s footnote 12.

In *Semore* v. *Pool* (1990) 217 Cal.App.3d 1087 [266 Cal.Rptr. 280], the plaintiff was discharged for refusing to take a random drug test (a pupillary reaction eye test). He filed suit for wrongful termination, alleging a violation of his right of privacy. The trial court sustained the employer's demurrer without leave to amend, finding that the employer had a compelling interest in a drug-free workplace, that the drug test at issue was nonintrusive, and that employees should expect to be tested in such a manner to determine their fitness for work. (*Id.* at p. 1093.)

The Fourth District Court of Appeal reversed. In doing so, the court found that the employer and employee could not have entered into a valid contract obligating the employee to take a drug test. The court stated: "While plaintiff could contractually agree not to assert his right to privacy, we think it clear that the employer could not use such an agreement to circumvent the public policy favoring privacy, and the employer could not successfully enforce such a contractual agreement if it intruded on plaintiff's right to privacy. . . . If the intrusion violates the right to privacy, it is illegal whether or not it is pursuant to an agreement. If pursuant to such an agreement, the agreement would be unenforceable because it would be against public policy." (217 Cal.App.3d at p. 1097, citation and fn. omitted.)

In *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1 [267 Cal.Rptr. 618], the plaintiff was terminated for refusing to submit a

urine sample as part of an unannounced drug test. She, too, based her public policy claim on the state constitutional right of privacy. A jury returned a verdict in her favor, and the employer appealed. The First District Court of Appeal held that the public policy claim was without merit. The court relied in part on *Foley*'s footnote 12, as follows: "Measured against the *Foley* standard, [the plaintiff] did not state a cause of action for wrongful termination in violation of public policy. The right to privacy is, by its very name, a private right, not a public one. The parties could have lawfully agreed that [the plaintiff] would submit to urinalysis without violating any public interest. Such an agreement between [the plaintiff] and [the employer] would not have been against public policy. . . . Therefore, under *Foley*, there was no violation of *public* policy." (218 Cal.App.3d at p. 28, italics in original.)[5]

In accordance with the foregoing authorities, we first identify the alleged rights underlying Lagatree's wrongful termination claim. We then determine whether those rights can be "bargained away" (*Gantt v. Sentry Insurance*, *supra*, 1 Cal.4th at p. 1100) or "circumvented by agreement of the parties" (*Foley*, *supra*, 47 Cal.3d at p. 670, fn. 12). If so, we consider other factors, if any, bearing on whether Lagatree's claim is supported by a substantial public policy. Applying that analysis here, we ultimately conclude that the rights at issue are subject to waiver by agreement and that additional factors weigh against the recognition of a public policy claim. As a result, the demurrers were properly sustained without leave to amend. (See *Foley*, *supra*, 47 Cal.3d at p. 670 & fn. 12; *Green v. Ralee Engineering Co.*, *supra*, 19 Cal.4th at pp. 75-76, 89-90.)

 The rights underlying Lagatree's claim are easily identified: an individual's constitutional rights to a jury trial and a judicial forum for the resolution of disputes. The question thus becomes whether those rights can be waived by agreement. As a general rule, they are subject to waiver.

With respect to the right to trial by jury, our Constitution provides: "A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel. In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute." (Cal. Const., art. I, § 16.) Under the Code of Civil

---

[5]In *Luck*, the plaintiff sued not only for wrongful termination but also for breach of the covenant of good faith and fair dealing. In reviewing the covenant claim, the court held that a private employer must have a "compelling interest" to justify an invasion of its employees' privacy. (218 Cal.App.3d at pp. 17-24 & fn. 13.) The California Supreme Court subsequently disapproved *Luck* on that point. (See *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 56-57 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

Procedure, "[t]rial by jury may be waived . . . by the . . . parties to an issue of fact in any of [several] ways." (Code Civ. Proc., § 631, subd. (a).)[6]

Indeed, in criminal cases, even where the defendant's life is at stake, a jury can be waived. (See, e.g., *People* v. *Scott* (1997) 15 Cal.4th 1188, 1207-1210 [65 Cal.Rptr.2d 240, 939 P.2d 354].) As for waiver in civil actions, one court has noted: "[T]he California Constitution cannot be read to prohibit individuals from waiving, in advance of any pending action, the right to trial by jury in a civil case. [¶] Our conclusion is supported by those cases upholding the validity of arbitration agreements." (*Trizec Properties, Inc.* v. *Superior Court* (1991) 229 Cal.App.3d 1616, 1618 [280 Cal.Rptr. 885].) It therefore appears that, as a general matter, the right to a jury trial can be bargained away.[7]

Similarly, the right to a judicial forum can generally be waived by contract: "[I]t has always been understood without question that parties could eschew [a] jury trial . . . by agreeing to a method of resolving [a] controversy, such as arbitration, which does not invoke a judicial forum. . . . [¶] . . . [¶] When parties agree to submit their disputes to arbitration they select a forum that is alternative to, and independent of, the judicial . . . ." (*Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d at pp. 713-714.)

While helpful, these general observations do not end our analysis. More specifically, we examine whether a predispute arbitration agreement is valid where (1) an employer insists on such an agreement as a condition of employment, and (2) an employee signs the agreement to avoid being discharged. That question, in turn, requires an understanding of the Federal Arbitration Act (FAA) (9 U.S.C. §§ 1-16) and its California counterpart.

B. *Enforcement of Arbitration Agreements*

"The FAA was designed 'to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate,' . . . and to place such agreements ' "upon the same footing as other contracts[.]" ' . . . While Congress was no

---

[6] Section 631, subdivision (a), of the Code of Civil Procedure lists the ways in which a jury trial can be waived, including the filing of a written consent with the court, the making of an oral statement in open court which is entered in the minutes or docket, the failure to appear at trial, the failure to announce in a timely manner that a jury is required, and the failure to make a timely deposit of jury fees.

[7] Inherent in an arbitration agreement is a waiver of trial by jury—a waiver that is not precluded by the Constitution or the Code of Civil Procedure. (See *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 712-714 [131 Cal.Rptr. 882, 552 P.2d 1178], construing Cal. Const., art. I, § 16, and Code Civ. Proc., § 631, subd. (a).)

doubt aware that the Act would encourage the expeditious resolution of disputes, its passage 'was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered.' " (*Volt Info. Sciences* v. *Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478 [109 S.Ct. 1248, 1255, 103 L.Ed.2d 488], citations omitted.) "The Arbitration Act thus establishes a 'federal policy favoring arbitration,' . . . requiring that 'we rigorously enforce agreements to arbitrate.' " (*Shearson/American Express, Inc.* v. *McMahon* (1987) 482 U.S. 220, 226 [107 S.Ct. 2332, 2337, 96 L.Ed.2d 185].)[8]

Section 2 of the FAA provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) The words "involving commerce" are to be interpreted broadly since the FAA "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." (*Perry* v. *Thomas* (1987) 482 U.S. 483, 490 [107 S.Ct. 2520, 2526, 96 L.Ed.2d 426]; accord, *Allied-Bruce Terminix Cos.* v. *Dobson* (1995) 513 U.S. 265, 273-275 [115 S.Ct. 834, 839-840, 130 L.Ed.2d 753].) The phrase "evidencing a transaction" simply means that "the 'transaction' in fact 'involv[es]' interstate commerce, even if the parties did not contemplate an interstate commerce connection." (*Allied-Bruce Terminix Cos.* v. *Dobson, supra,* 513 U.S. at p. 281 [115 S.Ct. at p. 843].)

In determining whether a predispute arbitration agreement is enforceable under the FAA, the Supreme Court has, on occasion, indicated that substantive federal law—a federal common law of contracts—should apply. (See, e.g., *Mitsubishi Motors* v. *Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 625-626 [105 S.Ct. 3346, 3353-3354, 87 L.Ed.2d 444]; *Southland Corp.* v. *Keating* (1984) 465 U.S. 1, 10-16 & fn. 9 [104 S.Ct. 852, 855-861, 862-864, 79 L.Ed.2d 1]; *id.* at pp. 19-21 (conc. and dis. opn. of Stevens, J.); *Moses H. Cone Hospital* v. *Mercury Constr. Corp., supra,* 460 U.S. at pp. 24-25 [103 S.Ct. at pp. 941-942.) More recently, however, the court has stated that "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." (*First Options of Chicago, Inc.* v. *Kaplan* (1995) 514 U.S. 938, 944 [115 S.Ct. 1920, 1924, 131 L.Ed.2d 985].) But the applicability of state law is not without limits: "We note . . . the choice-of-law issue that arises when defenses such as . . . unconscionability . . . are

---

[8]State courts have concurrent jurisdiction to enforce the FAA. (*Moses H. Cone Hospital* v. *Mercury Constr. Corp.* (1983) 460 U.S. 1, 25 [103 S.Ct. 927, 941-942, 74 L.Ed.2d 765].)

asserted. In instances such as these, the text of § 2 [of the FAA] provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the passage of that statute: An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law . . . , 'save upon such grounds as exist at law or in equity for the revocation of any contract.' . . . Thus state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. . . . A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable . . . ." (*Perry* v. *Thomas, supra*, 482 U.S. at p. 492, fn. 9 [107 S.Ct. at p. 2527], citations and italics omitted.)

 "[I]n applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act . . . , due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." (*Volt Info. Sciences* v. *Leland Stanford Jr. U., supra*, 489 U.S. at pp. 475-476 [109 S.Ct. at p. 1254], citation omitted.) "[G]enerally applicable [state law] contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." (*Doctor's Associates, Inc.* v. *Casarotto* (1996) 517 U.S. 681, 687 [116 S.Ct. 1652, 1656, 134 L.Ed.2d 902].) However, ". . . the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'" (*Volt Info. Sciences* v. *Leland Stanford Jr. U., supra*, 489 U.S. at p. 478 [109 S.Ct. at p. 1255].)

"We discern only two limitations on the enforceability of arbitration [clauses] governed by the Federal Arbitration Act: [(1)] they must be part of a written maritime contract or a contract 'evidencing a transaction involving commerce' and [(2)] such clauses may be revoked upon 'grounds as exist at law or in equity for the revocation of any contract.' We see nothing in the Act indicating that the broad principle of enforceability is subject to any

additional limitations under State law." (*Southland Corp.* v. *Keating, supra,* 465 U.S. at pp. 10-11 [104 S.Ct. at p. 858].)[9]

As stated, the FAA applies to "a contract evidencing a transaction involving commerce." (9 U.S.C. § 2.) Typically, courts look to the parties' contract and business operations in determining whether the contract falls within the scope of the FAA. (*Ideal Unlimited Services* v. *Swift-Eckrich, Inc.* (D.P.R. 1989) 727 F.Supp. 75, 76.) Here, "[t]here is no showing that [Lagatree,] while performing his duties under the employment contract[,] was working 'in' commerce, was producing goods for commerce, or was engaging in activity that affected commerce, within the meaning of [the FAA]." (*Bernhardt* v. *Polygraphic Co.* (1956) 350 U.S. 198, 200-201 [76 S.Ct. 273, 275, 100 L.Ed. 199].)[10] Nevertheless, the parties in this case have relied on decisions construing the FAA and so shall we. (See *Engalla* v. *Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971-972 [64 Cal.Rptr.2d 843, 938 P.2d 903].)[11]

Moreover, the question of the FAA's applicability appears to be academic. As one court has recognized: "[I]t is unclear what difference it would make if this case were deemed to be outside the scope of the FAA. The parties' agreement would still be a contract that waives [the employee's] right to a judicial forum for employment-related claims and agrees to submit those claims to arbitration. [The employer] would still have the right to seek enforcement of that contract. Although the applicability of the FAA may be significant in the sense that the statute prescribes certain procedural rules that might not otherwise obtain, we have little doubt that, even if an

---

[9]Thus, the FAA preempts a state statute that permits wage claims to be brought in court even though the claimant agreed to arbitrate them. (*Perry* v. *Thomas, supra,* 482 U.S., at pp. 489-491 [107 S.Ct. at pp. 2525-2526] [California Labor Code section 229 is preempted].) Further, state laws cannot mandate that arbitration agreements bear special notice provisions. (*Doctor's Associates, Inc.* v. *Casarotto, supra,* 517 U.S. at pp. 684, 686-688 [116 S.Ct. at pp. 1654-1655, 1655-1657] [FAA preempts Montana statute requiring that notice of arbitration clause be typed in underlined capital letters on first page of contract].)

[10]The Luce Forward agreement explicitly provides that it is to be governed by the FAA, while the Keesal Young agreement is silent on the matter. We express no opinion on the effect, if any, of the provision in the Luce Forward agreement.

[11]Section 1 of the FAA provides that the act does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (9 U.S.C. § 1.) Lagatree argues that this exemption covers *all* types of employment, such that the FAA does not apply to *any* employment contracts. That position is not without support. The Ninth Circuit recently adopted it. (*Craft* v. *Campbell Soup Co.* (9th Cir. 1998) 161 F.3d 1199.) However, nine other circuits have construed the exemption narrowly, finding that it applies only to employees actually engaged in the transportation of goods in commerce. (See *id.* at p. 1202, fn. 5 [listing circuits]; *Koveleskie* v. *SBC Capital Markets, Inc.* (7th Cir. 1999) 167 F.3d 361, 363-364 [same].) Under the majority view, Lagatree would not be exempt from the FAA (assuming he satisfies the commerce requirement). In any event, given the basis for our decision, we need not construe or apply the section 1 exemption.

arbitration agreement is outside the FAA, the agreement still may be enforced . . . ." (*Cole* v. *Burns Intern. Security Services* (D.C.Cir. 1997) 105 F.3d 1465, 1472 [323 App.D.C. 133].)

Assuming arguendo that the FAA does not apply, we would assess the validity of the parties' arbitration agreements under the California Arbitration Act (CAA) (Code Civ. Proc., §§ 1280-1294.2). Like the FAA, the CAA provides: "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281.)[12] "California law incorporates many of the basic policy objectives contained in the Federal Arbitration Act, including a presumption in favor of arbitrability . . . and a requirement that an arbitration agreement must be enforced on the basis of state law standards that apply to contracts in general . . . ." (*Engalla* v. *Permanente Medical Group, Inc.*, *supra*, 15 Cal.4th at pp. 971-972, citations omitted.)

Consequently, we need not decide whether the FAA applies. Even if it does not, we would reach the same result under the virtually identical provision of the CAA. "In most important respects, the California statutory scheme on enforcement of private arbitration agreements is similar to the [FAA]; the similarity is not surprising, as the two share origins in the earlier statutes of New York and New Jersey. . . . Code of Civil Procedure section 1281, like section 2 of the [FAA], provides that predispute arbitration agreements are 'valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract.' " (*Rosenthal* v. *Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 406 [58 Cal.Rptr.2d 875, 926 P.2d 1061], citations omitted.)[13]

## C. *Compulsory Arbitration Agreements*

We now turn to the question of the enforceability of predispute arbitration agreements imposed as a condition of employment. As noted, if they are

---

[12]As our Supreme Court has commented, the phrase "revocation of any contract" is "something of a misnomer. 'Offers are "revoked." . . . Contracts are extinguished by rescission.' " (*Engalla* v. *Permanente Medical Group, Inc.*, *supra*, 15 Cal.4th at p. 973.)

[13]As originally drafted, Assembly Bill No. 858 (1999-2000 Reg. Sess.) would have prohibited employers from requesting or requiring employees to enter into a predispute arbitration agreement. The Assembly passed the bill on June 4, 1999. In the Senate, the bill was amended several times before it was passed and returned to the Assembly on September 10, 1999. The Assembly did not concur in the Senate amendments and sent the bill to a conference committee on the last day of the 1999 legislative calendar. The bill, or a similar one, may be considered next year. However, even if the bill becomes law, it would not have any bearing on this appeal: "[T]o support a tort action for wrongful discharge, 'the policy in question . . .' . . . must be . . . 'well established' *at the time of the discharge*." (*Stevenson* v. *Superior Court, supra*, 16 Cal.4th at p. 889, italics added; accord, *Foley, supra*, 47 Cal.3d at p. 668.)

enforceable, then an employee's rights to a jury trial and a judicial forum can be bargained away. And if a right or duty can be waived by agreement, it is not rooted in a substantial public policy, absent other factors to the contrary.

In *Gilmer* v. *Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20 [111 S.Ct. 1647, 114 L.Ed.2d 26] (*Gilmer*), the plaintiff was required by his employer to register as a securities representative with the New York Stock Exchange (NYSE). His registration application, entitled "Uniform Application for Securities Industry Registration or Transfer," commonly known as a "Form U-4," provided for the arbitration of disputes in accordance with the rules of the NYSE. Those rules mandated the arbitration of " '[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative.' " (*Id.* at p. 23 [111 S.Ct. at pp. 1650-1651].) A Form U-4 is a standardized form, and its execution is a condition of employment for securities broker-dealers. (*Ibid.*; *Halligan* v. *Piper Jaffray, Inc.* (2d Cir. 1998) 148 F.3d 197, 198 & fn. 1; *Seus* v. *John Nuveen & Co., Inc.* (3d Cir. 1998) 146 F.3d 175, 177-178.)

The plaintiff in *Gilmer* was discharged at age 62. He filed an action in United States District Court, alleging a violation of the Age Discrimination in Employment Act of 1967 (ADEA) (29 U.S.C. § 621 et seq.). The Supreme Court held that, despite the compulsory nature of the Form U-4, the plaintiff could not pursue a civil action and was required to arbitrate his ADEA claim. As the court stated: "Mere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context. . . . [T]he FAA's purpose was to place arbitration agreements on the same footing as other contracts. Thus, arbitration agreements are enforceable 'save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2. 'Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract." ' . . . There is no indication in this case, however, that [the plaintiff,] an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application. . . . [T]his claim of unequal bargaining power is best left for resolution in specific cases." (500 U.S. at p. 33 [11 S.Ct. at pp. 1655-1656], citation omitted.)

As we read *Gilmer*, a predispute arbitration agreement is not invalid merely because it is imposed as a condition of employment. By directing that claims of economic coercion be decided on a case-by-case basis, the court in *Gilmer* necessarily concluded that compulsory arbitration agreements are not

invalid per se. Put another way, under *Gilmer*, the mandatory nature of an arbitration agreement does not, by itself, render the agreement unenforceable. This conclusion finds support in post-*Gilmer* cases.

In *Seus* v. *John Nuveen & Co., Inc., supra,* 146 F.3d 175, the court rejected the plaintiff's assertion that a Form U-4 is an invalid contract of adhesion. As the court put it, "This very argument was rejected in *Gilmer . . . .*" (*Id.* at p. 184.) The court continued: "In order for a contract to be invalidated as a contract of adhesion, the plaintiff 'must allege both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive.' . . . The district court found . . . that the terms of [the] Form U-4 were neither oppressive nor unconscionable. . . . We agree." (*Ibid.*; accord, *Koveleskie* v. *SBC Capital Markets, Inc., supra,* 167 F.3d at pp. 366-367 [Form U-4 not an unconscionable contract of adhesion where it was offered on "take it or leave it" basis]; *Rosenberg* v. *Merrill Lynch, Pierce, Fenner & Smith* (1st Cir. 1999) 170 F.3d 1, 17 [Form U-4 not invalid even though arbitration provision was nonnegotiable, and employer would not hire person who refused to sign form].)[14]

Similarly, in *Beauchamp* v. *Great West Life Assur. Co.* (E.D.Mich. 1996) 918 F.Supp. 1091, the court held that a Form U-4 was not an invalid contract of adhesion. Citing *Gilmer*, the court concluded that the form was not unconscionable. (*Id.* at pp. 1098-1099.) The court also commented that "[u]nder plaintiff's theory, practically every condition of employment would be an 'adhesion contract' which could not be enforced because it would have been presented to the employee by the employer in a situation of unequal bargaining power on a 'take it or leave it' basis." (*Id.* at p. 1098.)

Nor is *Gilmer* limited to employment in the securities industry. In *Kelly* v. *UHC Management Co., Inc.* (N.D.Ala. 1997) 967 F.Supp. 1240, the plaintiff employees, who worked for United HealthCare Corporation, signed an acknowledgment form and received an employee handbook mandating the arbitration of employment-related disputes. When the employees filed an action alleging race discrimination, the employer moved to stay the proceedings so that the parties could proceed with arbitration. In attempting to avoid arbitration, the employees asserted that the arbitration provisions had been offered on a "take it or leave it" basis. (*Id.* at p. 1257.) They also claimed

---

[14]In *Duffield* v. *Robertson Stephens & Co.* (9th Cir. 1998) 144 F.3d 1182, the Ninth Circuit held that the Civil Rights Act of 1991 (Pub.L. No. 102-166, 105 Stat. 1071) invalidates compulsory arbitration agreements with respect to statutory discrimination claims. Because the Civil Rights Act of 1991 does not apply to common law actions for wrongful termination, *Duffield* is not applicable here.

that "the arbitration policy was a mandatory condition of employment [since] an employee's choice was to accept the agreement to arbitrate employment disputes or discontinue his or her employment . . . ." (*Id.* at p. 1257, fn. 17.) The court enforced the arbitration clause, stating: "[A]ssuming *arguendo* that the arbitration agreements are adhesive—i.e., that they were offered on a take it or leave it basis with no opportunity for bargaining on the part of the plaintiffs—the agreements to arbitrate are nonetheless valid and enforceable. . . . '[T]here is nothing inherently unfair or oppressive about arbitration clauses.' . . . In fact, . . . the FAA shows a strong federal policy in favor of arbitration. . . . Second, nothing about the present agreement is unconscionable or overbearing. It simply requires the plaintiffs to submit their employment claims to arbitration rather than sue in court. In light of the strong federal policy in favor of arbitration, this agreement is not unconscionable." (967 F.Supp. at p. 1257, citations and fn. omitted; see *id.* at pp. 1250-1251 [discussing *Gilmer*]; accord, *Lang* v. *Burlington Northern R. Co.* (D.Minn. 1993) 835 F.Supp. 1104.)

And in *Rhode* v. *E & T Investments, Inc.* (M.D.Ala. 1998) 6 F.Supp.2d 1322, the court applied *Gilmer* to a dispute involving the purchase of a mobilehome. There, the purchase agreement contained an arbitration clause, and the parties also executed a separate arbitration agreement. The buyer filed a civil action against the seller and the manufacturer of the home, alleging breach of contract, among other things. The defendants moved to compel arbitration. In response, the buyer argued that the arbitration provisions were unconscionable. He predicted that " 'if all manufacturers and dealers [of mobilehomes] require the execution [of an arbitration agreement] as a condition precedent to closing the sale, the consumer is put into the unenviable position of either having to acquiesce to the seller's will or live in a tent.' " (*Id.* at p. 1328.) The court rejected the unconscionability argument, concluding that the buyer "fail[ed] to allege any facts to support the finding that arbitration would preclude [him] from bringing his claims against Defendants or that an arbitrator could not award [the] full panoply of relief available [under the] law." (*Ibid.*)

Turning our attention to California case law, we find the same trend. In *24 Hour Fitness, Inc.* v. *Superior Court* (1998) 66 Cal.App.4th 1199 [78 Cal.Rptr.2d 533], the plaintiff employee signed an arbitration agreement and certified that she had read the employer's personnel handbook, which described the arbitration process in detail. The employee later filed suit, alleging that she had been constructively discharged as a result of sexual harassment. In an effort to avoid arbitration, she relied on the CAA, arguing

that the arbitration agreement was unconscionable.[15] The court found the agreement to be valid, explaining:

"[U]nconscionability has both a procedural and a substantive element . . . . The procedural element focuses on the unequal bargaining positions and hidden terms common in the context of adhesion contracts. . . . While courts have defined the substantive element in various ways, it traditionally involves contract terms that are so one-sided as to 'shock the conscience,' or that impose harsh or oppressive terms. . . .[16]

"[The plaintiff's] attempt to invalidate the arbitration clause for unconscionability rests primarily on the undisputed fact that it was presented to her as part of an adhesion contract, i.e., ' " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " . . .' . . . Even assuming the circumstances here amount to procedural unconscionability, [the plaintiff] must still show the existence of a factual issue as to substantive unconscionability to defeat summary judgment . . . She has not done so. . . . [¶] Nor does she suggest any concrete reason why the terms of the agreement are unduly harsh, oppressive or one-sided." (*24 Hour Fitness, Inc.* v. *Superior Court, supra,* 66 Cal.App.4th at pp. 1212-1213, citations omitted; see *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 925, fn. 9 [216 Cal.Rptr. 345, 702 P.2d 503] [discussing analytical framework of unconscionability doctrine].)[17]

In the same vein, the plaintiff employees in *Brookwood* v. *Bank of America* (1996) 45 Cal.App.4th 1667 [53 Cal.Rptr.2d 515] and *Spellman* v. *Securities, Annuities & Ins. Services, Inc.* (1992) 8 Cal.App.4th 452 [10 Cal.Rptr.2d 427], executed a Form U-4 as a condition of employment. After they were

---

[15]To be specific, the employee invoked section 1281 of the Code of Civil Procedure, which, like section 2 of the FAA, provides that arbitration agreements are valid, enforceable, and irrevocable, save upon such grounds as exist for the revocation of any contract.

[16]"[T]here is a 'sliding scale relationship between the two concepts [of procedural and substantive unconscionability]: the greater the degree of substantive unconscionability, the less the degree of procedural unconscionability that is required to annul the contract or clause. . . .' " (*Ilkhchooyi* v. *Best* (1995) 37 Cal.App.4th 395, 410 [45 Cal.Rptr.2d 766], citations omitted.)

[17]In *24 Hour Fitness,* the court distinguished *Stirlen* v. *Supercuts, Inc.* (1997) 51 Cal.App.4th 1519 [60 Cal.Rptr.2d 138], stating: "In *Stirlen,* the unconscionable arbitration clause relegated all employee claims to arbitration while allowing the employer to enforce its rights in court . . . ; restricted the discovery available to employees, but not [the] employer . . . ; and unilaterally deprived employees, but not [the] employer, of significant statutory and common law remedies . . . . Here, in contrast, the arbitration clause applies equally to employer and employee; allows both parties substantially the same array of discovery procedures available in civil actions; and does not create an imbalance in remedies potentially available to either side." (66 Cal.App.4th at p. 1213, citations omitted.)

discharged, they each filed a civil action alleging wrongful termination under state law. The courts held that the FAA required the claims to be arbitrated.

California courts have also addressed the enforceability of arbitration agreements between securities brokers and their clients. (*Macaulay* v. *Norlander* (1992) 12 Cal.App.4th 1 [15 Cal.Rptr.2d 204]; *Strotz* v. *Dean Witter Reynolds, Inc.* (1990) 223 Cal.App.3d 208 [272 Cal.Rptr. 680], overruled on other grounds in *Rosenthal* v. *Great Western Fin. Securities Corp., supra,* 14 Cal.4th at p. 423.) In *Macaulay*, a brokerage firm required all of its clients to sign an agreement containing an arbitration clause. Two clients, who had signed the agreement, filed civil actions alleging that they had been defrauded. The firm petitioned the superior court to compel arbitration of the disputes. The superior court denied the petition. The Court of Appeal reversed, noting that " '[i]n the context of adhesion contracts, the courts have held that the inclusion of an arbitration provision is not per se unconscionable, particularly in a commercial transaction. . . .' " (12 Cal.App.4th at p. 6, citation omitted.)

In *Strotz*, another broker/client case, the court stated: "Where an agreement to arbitrate exists, the parties' mutual promises to forego a judicial determination and to arbitrate their disputes provide consideration for each other. Both parties give up the same rights and thus neither gains an advantage over the other." (223 Cal.App.3d at p. 216.) The *Strotz* court acknowledged that ". . . there may be arbitration provisions which do give an advantage to one party. . . . In those cases, however, it is not the requirement of arbitration alone which makes the provision unfair but rather the place or manner in which the arbitration is to occur." (*Id.* at p. 216, fn. 7.) Consequently, ". . . the fact that one party later seeks to avoid his agreement to arbitrate cannot alone preclude enforcement of the agreement." (*Id.* at p. 216.)

Finally, in *Izzi* v. *Mesquite Country Club* (1986) 186 Cal.App.3d 1309 [231 Cal.Rptr. 315], the court enforced an arbitration clause contained in a purchase agreement for a condominium, stating: "Even assuming arguendo the purchase agreement was adhesive in nature, we would still view it as enforceable. There is nothing in the circumstances of this case from which it appears the arbitration provision conflicts with the reasonable expectations of an ordinary person or is unduly oppressive or unconscionable. . . . The rules of the American Arbitration Association specified by the clause as

governing the resolution of disputes are generally regarded to be neutral and fair.[18] In other words, even if defendants did have bargaining power superior to that of plaintiffs, the application of the arbitration clause to this dispute does not engender any unjust advantage to defendants. The invocation of the adhesion doctrine is unwarranted on these facts." (*Id.* at p. 1318, citation and fn. omitted.)[19]

## D. *Validity of the Arbitration Agreements*

■ As we have seen, the cases uniformly agree that a compulsory predispute arbitration agreement is not rendered unenforceable just because it is required as a condition of employment or offered on a "take it or leave it" basis. An employee who signs such an agreement is obligated to submit employment-related disputes to arbitration; if he refuses to do so, the courts stand ready to compel arbitration. ■ Yet, as Lagatree would have it, he can refuse to sign an arbitration agreement, be discharged, and strike gold with a wrongful termination suit. The law does not permit such an absurd result.

As stated, if a claim of wrongful termination in violation of public policy is based on a right or duty that can be bargained away, the claim is not rooted in a substantial public policy, absent other factors to the contrary. As one commentator has noted: "The pertinent question is whether, in the overall mix, the nature of the forum for future disputes is a subject that may be determined by contract or whether this term belongs to the nonwaivable, nonmodifiable category and, hence, is outside of the realm of contract." (Estreicher, *Predispute Agreements to Arbitrate Statutory Employment Claims* (1997) 72 N.Y.U. L.Rev. 1344, 1354.) We think it plain that, under both federal and state law, an employee's rights to a jury trial and a judicial forum can be validly waived by agreement, even where the waiver is required as a

[18]In the present case, the Keesal Young arbitration agreement called for the application of the "commercial rules" of the American Arbitration Association (AAA). However, effective June 1, 1996, approximately one year before Lagatree was terminated, the AAA adopted special rules to govern the arbitration of employment disputes (National Arbitration Rules for the Resolution of Employment Disputes (AAA 1996)). As stated therein, "[t]he parties shall be deemed to have made *these* rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association . . . [and if] an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules." (*Id.*, rule 1, at p. 8, italics added.) The new rules were adopted to "ensure[] fairness and equity for the resolution of workplace disputes" and to "administer cases in accordance with . . . due process standards . . . ." (*Id.*, Introduction, at p. 3.)

[19]Because Lagatree knew what he was being asked to sign, there is no contention that the arbitration agreements "[did] not fall within the reasonable expectations of the weaker or 'adhering' party . . . ." (*Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820 [171 Cal.Rptr. 604, 623 P.2d 165].)

condition of employment. As a result, those rights do not implicate a substantial public policy, absent other factors to the contrary. Here, we find that other factors reinforce the conclusion that a public policy claim should not be allowed.

To date, wrongful termination cases involving public policy violations have typically concerned employer conduct that burdened the public good with an actual detriment and conferred absolutely no benefit on the public. By way of example, in *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314], the employer insisted that an employee participate in an illegal price-fixing scheme; in *Green* v. *Ralee Engineering Co., supra,* 19 Cal.4th 66, the employer retaliated against an employee for complaining to management that the company was making defective aircraft parts; in *Rojo* v. *Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373], the employer was accused of sex discrimination; in *Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [344 P.2d 25], the employer instructed an employee to perjure himself before a state legislative committee; and in *Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015], the employer discharged an employee for protesting unsafe working conditions. In all of these cases, "general social policies [were] advanced" by permitting a wrongful termination claim in violation of public policy. (*Green* v. *Ralee Engineering Co., supra,* 19 Cal.4th at p. 75.)

Here, general social policies will be advanced by *not* allowing a wrongful termination claim. This is so because public policy favors the resolution of disputes through arbitration. To impose liability in a case such as this would thwart that policy.

By enacting the CAA, "the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' " (*Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899].) "Because of the relatively low cost and efficiency of the arbitration process, an individual [employee] involved in a typical [employment] dispute frequently will find an arbitral forum more accessible than the more expensive and cumbersome court system." (*Moore* v. *Conliffe* (1994) 7 Cal.4th 634, 657 [29 Cal.Rptr.2d 152, 871 P.2d 204].) "[A]rbitration has become an accepted and favored method of resolving disputes . . . , praised by the courts as an expeditious and economical method of relieving overburdened civil calendars . . . ." (*Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d at pp. 706-707.) In short, arbitration is viewed as a "common, expeditious, and judicially favored method [of resolving disputes]." (*Id.* at p. 707; accord, *Mitsubishi Motors* v. *Soler Chrysler-Plymouth, supra,* 473 U.S. at p. 633 [105 S.Ct. at p. 3357].)

Lagatree points out that, although courts often laud the benefits of arbitration, " 'the policy favoring arbitration cannot displace the necessity for a *voluntary* agreement to arbitrate.' " (*Victoria* v. *Superior Court* (1985) 40 Cal.3d 734, 739 [222 Cal.Rptr. 1, 710 P.2d 833], italics added and omitted; accord, *Lawrence* v. *Walzer & Gabrielson* (1989) 207 Cal.App.3d 1501, 1505 [256 Cal.Rptr. 6].) "Arbitration . . . is a matter of consent, not coercion . . . ." (*Volt Info. Sciences* v. *Leland Stanford Jr. U., supra*, 489 U.S. at p. 479 [109 S.Ct. at p. 1256].) But, as *Gilmer* and its progeny make clear, the compulsory nature of a predispute arbitration agreement does not render the agreement unenforceable on grounds of coercion or for lack of voluntariness.

In *Seus* v. *John Nuveen & Co., Inc., supra*, 146 F.3d 175, the court addressed the question of whether the plaintiff had knowingly and voluntarily agreed to arbitrate her statutory discrimination claims arising under federal law. The court said: "By 'knowing' and 'voluntary,' [the plaintiff] means more than with an understanding that a binding agreement is being entered and without fraud or duress. Determining whether an agreement to arbitrate is 'knowing' and 'voluntary,' in her view, requires an inquiry into such matters as the specificity of the language of the agreement, the plaintiff's education and experience, plaintiff's opportunity for deliberation and negotiation, and whether plaintiff was encouraged to consult counsel. She does not contend that this heightened 'knowing and voluntary' standard is a *generally applicable principle of contract law*. . . . Applying that standard here would be inconsistent with the FAA and *Gilmer*. Nothing short of a showing of fraud, duress, mistake or some other ground recognized by the law *applicable to contracts generally* would have excused the district court from enforcing [the plaintiff's] agreement." (*Id.* at pp. 183-184, italics added.)

As one federal court has accurately noted: "Arbitration clauses such as the one in *Gilmer* are, for the average employee, not the product of bargaining but a non-negotiable adhesion contract. Consent to the arbitration clause is the price for obtaining or retaining employment." (*Krahel* v. *Owens-Brockway Glass Container, Inc.* (D.Or. 1997) 971 F.Supp. 440, 448.) Even so, the courts have characterized the arbitration agreement in *Gilmer*—despite its compulsory nature—as consensual and voluntary. (See, e.g., *Penny* v. *United Parcel Service* (6th Cir. 1997) 128 F.3d 408, 412; *Nichols* v. *General Motors Co.* (S.D.Ohio 1997) 978 F.Supp. 743, 748; *Gray* v. *Toshiba America Consumer Products, Inc.* (M.D.Tenn. 1997) 959 F.Supp. 805, 809; see also *Securities Industry Ass'n* v. *Connolly* (D.Mass. 1988) 703 F.Supp. 146, 152-153 [holding, pre-*Gilmer*, that state law requirement of voluntariness cannot interfere with validity of mandatory arbitration agreement] affd. (1st Cir. 1989) 883 F.2d 1114.)

Of significance, our own Supreme Court has observed: "In *Gilmer*, a securities representative had been *required* by his employer to register with the New York Stock Exchange. The registration application included an agreement to arbitrate any dispute arising out of the employment or termination of the employment . . . [¶] The court reasoned that the plaintiff had agreed *voluntarily* to arbitrate his statutory claim . . . . [¶] . . . [¶] . . . In *Gilmer*, the court emphasized that *by agreeing* to arbitrate[,] the plaintiff had traded the more extensive procedures available in the federal court for the simplicity, informality, and expedition of arbitration." (*Brosterhous* v. *State Bar* (1995) 12 Cal.4th 315, 331-332 [48 Cal.Rptr.2d 87, 906 P.2d 1242], italics added.) Accordingly, we reject Lagatree's assertion that a compulsory arbitration agreement is invalid for lack of consent or voluntariness.

Finally, Lagatree argues that an employee cannot be terminated for refusing to sign an unenforceable agreement. Specifically, he argues that the Keesal Young arbitration agreement was unenforceable because it made arbitration so costly that employees could not afford to pursue a claim.[20] His argument focuses on two provisions in the Keesal Young agreement. We address them in turn.

First, the agreement stated that arbitration would be conducted in accordance with the rules of the AAA. (See fn. 18, *ante*.) Lagatree argues that the administrative fees imposed by the AAA are so high that they effectively preclude an employee from initiating arbitration. We disagree. Although the AAA rules do establish administrative fees (which include filing fees, hearing fees, and hearing room rental fees), rule 35 provides that "[t]he AAA may, in the event of extreme hardship on any party, defer or reduce the administrative fees." (National Arbitration Rules for the Resolution of Employment Disputes, *supra*, rule 35, at p. 27.) Consequently, we perceive no unfairness with regard to the AAA administrative fees.[21]

Second, Lagatree takes issue with the provision in the Keesal Young agreement that "the entire cost of the arbitration . . . shall be borne by the losing party." Because the agreement called for a panel of three retired

---

[20]Lagatree does not challenge the Luce Forward agreement on this ground. (See fn. 30, *post*.)

[21]We also find that the AAA rules governing discovery and remedies are fair to claimants. "The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute." (National Arbitration Rules for the Resolution of Employment Disputes, *supra*, rule 7, at pp. 12-13.) And "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including, but not limited to, any remedy or relief that would have been available to the parties had the matter been heard in court." (*Id.*, rule 32, at pp. 25-26.)

superior court judges, so the argument goes, a claimant had to be prepared to pay $1,500 an hour in arbitrator fees if he ultimately lost the arbitration. As Lagatree sees it, Keesal Young required its employees to agree to arbitration, but failed to provide an affordable forum in which they could seek relief.

In support of that contention, Lagatree relies on *Cole* v. *Burns Intern. Security Services*, *supra*, 105 F.3d 1465. There, the District of Columbia Circuit held that, in an employment-related arbitration, an employer cannot require an employee to pay any portion of the arbitrator fees. (*Id.* at pp. 1483-1486.) The court stated: "These fees would be prohibitively expensive for an employee . . . , especially after being fired from his job, and it is unacceptable to require [him] to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court. . . . [¶] Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment. Absent this requirement, the employee would be free to pursue his claims in court without having to pay for the services of a judge. In such a circumstance—where arbitration has been imposed by the employer and occurs only at the option of the employer—arbitrators' fees should be borne solely by the employer." (105 F.3d at p. 1484.)[22]

Of course, the question before us is not whether a particular provision in the Keesal Young arbitration agreement would be enforceable today. Rather, the question is whether Keesal Young violated a public policy that was "not only 'fundamental' and 'substantial,' but also *well established*' at the time of [*Lagatree's*] *discharge*." (*Stevenson* v. *Superior Court*, *supra*, 16 Cal.4th at p. 889, italics added; accord, *Foley*, *supra*, 47 Cal.3d at p. 668.) The public policy at issue must be " '. . . tether[ed] . . . to specific constitutional or statutory provisions . . . to ensure that employers have *adequate notice* of the conduct that will subject them to tort liability to the employees they discharge . . . .' " (*Stevenson* v. *Superior Court*, *supra*, 16 Cal.4th at p. 889, italics added.) " '. . . Th[e] determination [of whether an employer has violated public policy] depends in large part on whether the public policy alleged is *sufficiently clear* to provide the basis for such a potent remedy.' " (*Ibid.*, italics added.) Here, in order to make that determination, we look to the state of the law as it existed in June 1997, when Keesal Young discharged Lagatree. (See *Luck* v. *Southern Pacific Transportation Co.*, *supra*, 218 Cal.App.3d at p. 29.)

---

[22] The arbitration agreement in *Cole*, unlike the one here, gave only the employer the right to seek arbitration. (105 F.3d at p. 1469.) If an employee filed a civil action, the employer had 60 days within which to move for arbitration. (*Ibid.*) If the employer filed a civil action, the employee had no authority to compel arbitration. (*Ibid.*) We also note that *Cole* addressed the imposition of arbitrator fees in a dispute involving *statutory* claims. For purposes of this appeal, we assume that *Cole*'s analysis applies to common law claims for wrongful termination in violation of public policy.

Our survey of arbitration cases convinces us that, as of June 1997, there was not a well-established policy in California against imposing arbitrator fees on the losing party in an employment-related arbitration. On the contrary, the law authorized the use of such cost-shifting measures. Since 1961, with the enactment of the CAA (see Stats. 1961, ch. 461, § 2, pp. 1540-1552), the payment of arbitrator fees has been governed by section 1284.2 of the Code of Civil Procedure (see *Austin* v. *Allstate Ins. Co.* (1993) 16 Cal.App.4th 1812, 1815 [21 Cal.Rptr.2d 56]). That statute states: "Unless the arbitration agreement otherwise provides or the parties to the arbitration otherwise agree, each party to the arbitration shall pay his pro rata share of the expenses and fees of the neutral arbitrator, together with other expenses of the arbitration incurred or approved by the neutral arbitrator, not including counsel fees or witness fees or other expenses incurred by a party for his own benefit." (Code Civ. Proc., § 1284.2 (section 1284.2), added by Stats. 1961, ch. 461, § 2, p. 1545.)[23]

In *Tipton* v. *Systron Donner Corp.* (1979) 99 Cal.App.3d 501 [160 Cal.Rptr. 303], the court applied section 1284.2 in the context of an employment dispute. There, an employee had been discharged, and he challenged his termination through arbitration. The dispute was heard by a panel of three arbitrators.[24] The parties' agreement stated that "all costs, including those incurred in the court proceedings, shall be assessed against and borne by the disaffirming party." (99 Cal.App.3d at p. 507.) In a two-to-one decision, the arbitrators found that there was good cause for the termination. In confirming the arbitration award, the trial court awarded costs to the employer for both the arbitration and the court proceedings. The trial court also ruled that the employee was liable for all of the neutral arbitrator's fees. On appeal, the employee challenged the award of costs, arguing that the fees of the neutral arbitrator—approximately $10,000—should have been split between the parties. The Court of Appeal rejected that argument, finding that, under section 1284.2 and the parties' agreement, the trial court had properly imposed the entire cost of the neutral arbitrator on the employee. (99 Cal.App.3d at pp. 507-508.)[25]

In *Dickinson* v. *Kaiser Foundation Hospitals* (1980) 112 Cal.App.3d 952 [169 Cal.Rptr. 493], the claimant brought a medical malpractice claim against a hospital. Pursuant to the parties' agreement, the dispute was submitted to arbitration. The arbitration panel, consisting of three arbitrators,

---

[23]The CAA provides that an arbitration shall be conducted by a single neutral arbitrator unless the parties' agreement states otherwise. (Code Civ. Proc., § 1282, subd. (a).)

[24]In accordance with the arbitration agreement, each side chose one arbitrator. Because the two arbitrators could not agree on an outcome, they selected a third, neutral arbitrator.

[25]The employee paid his half of the fees directly to the arbitrator and, as ordered by the trial court, reimbursed the employer for the other half. (99 Cal.App.3d at pp. 507-508.)

awarded the claimant $655,200 in damages but directed that the parties bear their own costs. In confirmation proceedings before the trial court, the claimant requested that the award be "corrected" to reflect that he was entitled to costs of approximately $9,000. The trial court rejected the request and entered judgment on the award. The Court of Appeal affirmed, stating that, under the CAA (§ 1284.2), the parties were to bear their own costs unless they had agreed otherwise. Because there was no such agreement, the claimant was not entitled to costs. (112 Cal.App.3d at p. 954; see also *Kauffman* v. *Shearson Hayden Stone, Inc.* (1982) 128 Cal.App.3d 809 [180 Cal.Rptr. 566] [affirming order awarding half of arbitrator fees to prevailing party].)

Thus, by enacting section 1284.2, "[t]he Legislature has . . . established a policy that arbitration costs are to be paid by the party incurring them [unless the parties agree otherwise]. Under this statutory scheme, [a party] is not entitled to the costs [he or] she incurred in arbitration [absent an agreement to the contrary]. We recognize that there will be instances of unavoidably high arbitration expenses disproportionate to the amount recoverable . . . , resulting in inadequate compensation to the claimants, and are sympathetic to those finding themselves in that position. We believe however, that any relief in this regard must be provided by the Legislature." (*Austin* v. *Allstate Ins. Co.*, *supra*, 16 Cal.App.4th at p. 1817.)[26]

Against this backdrop of state law, we have the February 1997 decision of the District of Columbia Circuit in *Cole* v. *Burns Intern. Security Services*, *supra*, 105 F.3d 1465, which was handed down approximately five months before Lagatree was terminated at Keesal Young. As far as we can tell, *Cole* was the first decision to hold that arbitrator fees in an employment-related arbitration cannot be imposed on an employee.

Assuming that *Cole* made its way to California in five months, we doubt that employers here would have viewed it as a source of well-established public policy. For one thing, the language in *Cole* did not readily lend itself to common law claims for wrongful termination. By way of example, the

---

[26]By its own terms, section 1284.2 governs the fees of "neutral" arbitrators, which the CAA defines as arbitrators who are "selected jointly by the parties or by the arbitrators selected by the parties . . . ." (Code Civ. Proc., § 1280, subd. (d).) In his suit against Keesal Young, Lagatree alleged that disputes were to be resolved by a panel of three arbitrators, but he did not allege how the arbitrators were to be chosen or whether any of them would be selected jointly by the parties. Lagatree has not asserted that nonneutral arbitrators would be used, nor has he challenged the arbitration agreement on that basis. (See *Graham* v. *Scissor-Tail, Inc.*, *supra*, 28 Cal.3d at pp. 821-828.) As a result, we do not address any issues concerning the use of nonneutral arbitrators. (See *Graham* v. *Lenzi* (1995) 37 Cal.App.4th 248, 259, fn. 10 [43 Cal.Rptr.2d 407]; *MST Farms* v. *C. G. 1464* (1988) 204 Cal.App.3d 304, 306 [251 Cal.Rptr. 72].)

*Cole* court stated: "[I]n *Gilmer*[, *supra*, 500 U.S. 20,] the Supreme Court endorsed a system of arbitration in which employees are not required to pay for the arbitrator assigned to hear their statutory claims. . . . Under *Gilmer*, arbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine Congress's intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court." (*Cole* v. *Burns Intern. Security Services*, *supra*, 105 F.3d at p. 1484.)

 ██ ██ Further, we question whether *Cole*—a nonbinding decision from another jurisdiction—could support a well-established public policy under California law.[27] The subsequent judicial treatment of *Cole* illustrates the pitfalls of relying on a single non-California case in attempting to determine state public policy.

At least two federal circuits, the Tenth and Eleventh, have followed *Cole*. (*Shankle* v. *B-G Maintenance Management of Colorado* (10th Cir. 1999) 163 F.3d 1230, 1234-1235; *Paladino* v. *Avnet Computer Technologies, Inc.* (11th Cir. 1998) 134 F.3d 1054, 1062). However, in a more recent decision, the Eleventh Circuit strongly suggested that *Cole* might not apply where, as here, the arbitration agreement requires that all fees and costs be paid by the losing party (as opposed to imposing all or a portion of them on the employee even if he prevails). (*Randolph* v. *Green Tree Financial Corp.—Alabama* (11th Cir. 1999) 178 F.3d 1149, 1158; see also *Rosenberg* v. *Merrill Lynch, Pierce, Fenner & Smith*, *supra*, 170 F.3d at pp. 15-16 [arbitration agreement may be valid if it mandates award of fees and costs to prevailing party].)

The First and Seventh Circuits have also discussed *Cole*, but have concluded that a challenge to arbitrator fees should not be made unless and until such expenses have actually been imposed on a claimant. (*Rosenberg* v. *Merrill Lynch, Pierce, Fenner & Smith*, *supra*, 170 F.3d at pp. 15-16; *Koveleskie* v. *SBC Capital Markets, Inc.*, *supra*, 167 F.3d at p. 366.) In those circuits, ". . . the *possibility* that a plaintiff may be required to pay arbitration fees is not, by itself, a sufficient reason to invalidate an agreement to

---

[27]Although decisions of the United States Supreme Court are not binding with respect to state law (see *Kelly* v. *Vons Companies, Inc.* (1998) 67 Cal.App.4th 1329, 1337 [79 Cal.Rptr.2d 763]), they are entitled to "respectful consideration" (*People* v. *Guiton* (1993) 4 Cal.4th 1116, 1126 [17 Cal.Rptr.2d 365, 847 P.2d 45]). We express no view as to whether such a decision could support a public policy claim under California law. (Cf. *Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 213-214 [266 Cal.Rptr. 638, 786 P.2d 365]; *Rifkind & Sterling, Inc.* v. *Rifkind* (1994) 28 Cal.App.4th 1282, 1289-1293 [33 Cal.Rptr.2d 828]; *Meanley* v. *McColgan* (1942) 49 Cal.App.2d 203, 209 [121 P.2d 45].)

arbitrate . . . because the arbitral panel may not in fact require the plaintiff to pay fees and, if a plaintiff believes that excessive fees have been levied against him or her, judicial review of the imposition of the fees is available after arbitration." (*Arakawa* v. *Japan Network Group* (S.D.N.Y. 1999) 56 F.Supp.2d 349, 354, italics added; see *Howard* v. *Anderson* (S.D.N.Y. 1999) 36 F.Supp.2d 183, 186-187.)[28]

■ So, we state the obvious. As the post-*Cole* decisions indicate, a rule of law announced in one case may be modified, limited, or distinguished in later cases. For our purposes, it is sufficient to point out that the holding in *Cole,* as subsequently applied by the First and Seventh Circuits and as suggested by the Eleventh Circuit, would not support a public policy claim against Keesal Young.[29]

Moreover, in light of California law on the subject of arbitrator fees (i.e., section 1284.2 and the cases construing it), employers did not have "adequate notice" in June 1997 that a cost-shifting provision would violate a "clear" public policy. (*Stevenson* v. *Superior Court, supra,* 16 Cal.4th at p. 889.) Indeed, in *Tipton* v. *Systron Donner Corp., supra,* 99 Cal.App.3d 501, the court enforced just such a provision. In addition, the provision in the Keesal Young agreement was mutual: It imposed arbitrator fees on the "losing party," be it the employer or the employee. In that sense, the provision was indistinguishable from a clause requiring the losing party to pay the prevailing party's attorneys' fees and costs—a clause that was undeniably valid. (See *DiMarco* v. *Chaney* (1995) 31 Cal.App.4th 1809 [37 Cal.Rptr.2d 558]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 1999) ¶¶ 5:430-5:431, 5:434-5:434.1, rev. #1, 1999, pp. 5-167, 5-170.)

In any event, we need not take a poll among employers or stretch the bounds of judicial notice to conclude that, in June 1997, California did not have a well-established policy against imposing arbitrator fees on the losing party in an employment-related arbitration.

Nothing in *California Teachers Assn.* v. *State of California* (1999) 20 Cal.4th 327 [84 Cal.Rptr.2d 425, 975 P.2d 622], handed down by the

---

[28]Plainly, under the Keesal Young agreement, if an employee were to prevail at the arbitration, he would not have to pay any portion of the arbitrator fees.

[29]Interestingly, in *Cole* itself, the court held that the arbitration agreement was valid. There, the agreement was silent as to the allocation of arbitrator fees. (105 F.3d at pp. 1468, 1480-1481, 1485-1486.) The court stated: "[W]e hold that [the employee] could not be required to agree to arbitrate his public law claims as a condition of employment if the arbitration agreement required him to pay all or part of the arbitrator's fees and expenses. In light of this holding, we find that the arbitration agreement in this case is valid and enforceable. We do so because we interpret the agreement as requiring [the employer] to pay all of the arbitrator's fees . . . ." (105 F.3d at p. 1485.)

Supreme Court four months ago, compels a different conclusion. There, the court held that, under the due process clause, a public school teacher threatened with suspension or dismissal cannot be required to pay half the cost of the administrative law judge (ALJ) who hears the teacher's challenge to the proposed action. The court found unconstitutional section 44944, subdivision (e), of the Education Code, which imposed half the cost of the ALJ on a teacher who did not prevail in the administrative proceeding or who prevailed at the administrative level but lost in a subsequent judicial challenge to the ALJ's decision. In reaching that conclusion, the four-member majority relied in part on *Cole* v. *Burns Intern. Security Services, supra*, 105 F.3d 1465. (See *California Teachers Assn.* v. *State of California, supra*, 20 Cal.4th at pp. 333, 355-356.) Assuming arguendo that the high court now views *Cole* as the law in California, we note that the issue of liability here is governed by public policy as it existed two years ago.[30]

### E. *Remaining Theories of Liability*

Lagatree argues that predispute arbitration provisions imposed as a condition of employment have the purpose and effect of lessening an employer's liability for its future wrongful conduct, thereby violating Civil Code section 1668's prohibition on exculpatory clauses. (See fn. 2, *ante.*)

As one court has commented: " 'Traditionally, the law has looked carefully and with some skepticism at those who attempt to contract away their legal liability for the commission of torts. This general policy of the common law found legislative expression early in California history with the enactment of Civil Code section 1668. This section made it clear a party could not contract away liability for his fraudulent or intentional acts or for his negligent violations of statutory law. . . .' " (*Baker Pacific Corp.* v. *Suttles* (1990) 220 Cal.App.3d 1148, 1153 [269 Cal.Rptr. 709].)

Lagatree's contention that a compulsory arbitration provision ipso facto constitutes an invalid exculpatory clause is foreclosed as a matter of law.

---

[30]After the reply briefs were filed in this case, the parties submitted supplemental letter briefs discussing the effect on this appeal, if any, of the Supreme Court's decision in *California Teachers Assn.* v. *State of California, supra*, 20 Cal.4th 327. Relying on *Cole*, Lagatree argued for the first time that the Luce Forward arbitration agreement was invalid because it was *silent* as to (1) the allocation of arbitrator fees and (2) the availability of prehearing discovery. However, Lagatree cannot raise those issues for the first time in a letter brief. (See *Herman* v. *Los Angeles County Metropolitan Transportation Authority* (1999) 71 Cal.App.4th 819, 822, fn. 3 [84 Cal.Rptr.2d 144]; *Trustees of Capital Wholesale Electric etc. Fund* v. *Shearson Lehman Brothers, Inc.* (1990) 221 Cal.App.3d 617, 626-627 [270 Cal.Rptr. 566].) This is especially so, given that Lagatree relied on *Cole* extensively in his briefs on the Keesal Young appeal but cited *Cole* only once in his briefs on the Luce Forward appeal—to explain why *Cole*, as interpreted by Luce Forward, was *not* applicable. In any event, as *Cole* demonstrates, an arbitration agreement that is silent on an issue is still valid because it can be interpreted in favor of the employee. (See fn. 29, *ante.*)

"Such generalized attacks on arbitration 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants,' and as such, they are 'far out of step with our current strong endorsement of . . . this method of resolving disputes.'" (*Gilmer, supra*, 500 U.S. at p. 30 [111 S.Ct. at p. 1654].) "'[B]y agreeing to arbitrate à . . . claim, a party does not forgo the substantive rights afforded by the [cause of action]; it only submits to their resolution in an arbitral, rather than a judicial, forum.'" (*Id.* at p. 26 [111 S.Ct. at p. 1652].) It follows that a compulsory arbitration provision does not affect an employer's liability for future wrongdoing. Potential liability remains the same; only the forum is changed.[31]

Lastly, Lagatree acknowledges that his claim under the Unfair Competition Law (Bus. & Prof. Code, §§ 17200-17209) rests on the same alleged violation of public policy that supports the wrongful termination claim. Because we have concluded that there was no violation of public policy, the unfair competition claim fails as well.

## DISPOSITION

The judgments are affirmed.

Spencer, P. J., and, Ortega, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 19, 2000. Mosk, J., was of the opinion that the petition should be granted.

---

[31]Lagatree asserts that disputed issues of fact precluded the resolution of his claim under Civil Code section 1668. Not so. In both complaints, Lagatree merely alleged in conclusory fashion that compulsory predispute arbitration agreements lessen an employer's liability for future misconduct. However, the language of the arbitration agreements proves otherwise. Nothing in *Farnham* v. *Superior Court* (1997) 60 Cal.App.4th 69 [70 Cal.Rptr.2d 85], upon which Lagatree relies, is to the contrary.